**IN THE**
**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| MAJOR MIKE WEBB, d/b/a FRIENDS FOR MIKE WEBB (C00591537), a/k/a MAJOR MIKE WEBB FOR CONGRESS (H6VA08229)<br>   *Petitioner, Pro Se,*<br><br>v.<br><br>MARK ELLIOT ZUCKERBERG, META PLATFORMS, INC., JERRAULD "JAY" JONES, in official capacity as the ATTORNEY GENERAL, Virginia State BOARD OF ELECTIONS, JOHN O'BANNON, ROSALYN R. DANCE, GEORGIA ALVIS-LONG, CHRISTOPHER P. STOLLE and J. CHAMPMAN PETERSEN, in their official capacities, VIRGINIA DEPARTMENT OF ELECTIONS, STEVEN KOSKI, in official capacity as the COMMISSIONER OF ELECTIONS and DEPARTMENT OF ELECTIONS,<br>   *Respondents.* | Civil Case No. 1:26cv568 |

## VERIFIED COMPLAINT

This day, the undersigned, Petitioner, *pro se*, in the above referenced case,

Major Mike Webb (legal name), doing business as Friends for Mike Webb, FEC No.

C00591537, also known as Major Mike Webb for Congress (H6VA08229),

hereinafter referred to as "Webb," brings this action in a consolidated, civil

complaint, averring claims arising under state and federal law against Respondents

Mark Elliot Zuckerberg ("Zuckerberg"), Meta Platforms, Inc. ("Meta"), Respondents

Jerrauld "Jay" Jones, Esq. ("VAAG"), in official capacity as Attorney General for the

Commonwealth of Virginia, John O'Bannon ("Board Chairman"), in official capacity

as Chairman of the Board of Elections, Rosalyn R. Dance, Georgia Alvis-Long, Christopher P. Stolle, and J. Chapman Petersen-in their official capacities ("Elections Board"), as well as the Virginia Department of Elections (VDOE), and its head, Steven Koski, in his official capacity as Commissioner of the Virginia Department of Elections, in official capacity as Commissioner for the Virginia Department of Elections and the Department of Elections ("Commissioner"), and, herein, alleges for in complaint, and petition of grievances, in the above referenced matter, as follows:

### "Everyone Lost Something

1. "Our *Constitution* was made only for a moral and religious People", deemed to be "wholly inadequate to the government of any other", John Adams, *Address to Massachusetts Militia*, October 11, 1798, and "we were hit with a virus that was met with silence and spread unchecked"; "[d]enials for days, weeks, then months that led to more deaths, more infections, more stress, and more loneliness". Briefing Room, "Remarks by President Biden on the Anniversary of the COVID-19 Shutdown," *The White House*, March 11, 2021.

2. "While it was different for everyone, we all lost something", and, sadly, "We lost faith in whether our government and our democracy can deliver on really hard things for the American people." *Id.*

3. According to Meta and Bezos, they were only "following consultations with leading health organizations, including the World Health Organization (WHO)," when, in February 2021, they had begun "expanding the list of false claims we will remove to include additional debunked claims about the coronavirus and

vaccines", Staff, "Removing More False Claims About COVID-19 and Vaccines", *Meta*, February 8, 2021; however, that world public health organization had early emphasized that "[d]escribing the situation as a pandemic does not change WHO's assessment of the threat posed by this virus", Tedros Adhanom Ghebreyesus, "WHO Director-General's opening remarks at the media briefing on COVID-19," *WHO*, March 11, 2020, about which they had been quite convinced, even upon examination of "the best available evidence", *United Steelworkers of Am. v. Marshall*, 647 F.2d 1189 (D.C. Cir. 1980), and after deploying to China the manpower equivalent of two military brigades[1] of epidemiologists, engaged in "painstaking," contact tracing, "with a high percentage of identified close contacts completing medical observation", in February 2020, to examine 19 times more cases than had yet been reported in the entire U.S. by mid-March 2020[2], to determined that "[b]etween 1% and 5% of contacts were subsequently laboratory confirmed cases of COVID-19, depending on location", warranting the clinical conclusion that "it is not clear whether this [even] correlates with the presence of an infectious virus." *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, February 16-24, 2020.

4. "In order to be treated as speech involving a matter of public concern, the

---

[1] Staff, "Military Units: Army," DoD, https://www.defense.gov/Multimedia/Experience/Military-Units/Army/ (accessed August 29, 2024).

[2] Jessie Yeung, et al., "March 15 coronavirus news," CNN, March 15, 2020.

interested community need not be especially large nor the relevant concern of 'paramount importance or national scope.'" *Snyder v. Phelps*, 580 F.3d 206 (4th Cir. 2009) (quoting *Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122 (1st Cir. 1997).

5. Courts must "'assess how an objective, reasonable reader would understand' a statement, '*emphasiz[ing] the verifiability of the statement*,' since 'a statement not subject to objective verification is not likely to assert actual facts.'" *McCullough v. Gannett Co.*, Civ. Act. No. 1:2022cv01099, 2023 WL 3075940 (E.D.Va. April 25, 2023) (quoting *Snyder*, 580 F.3d at 206) (emphasis added).

6. "[T]he *First Amendment* protects statements 'relating to matters of public concern *which [do] not contain a provably false factual connotation*'", *McCullough*, Civ. Act. No. 1:2022cv01099, *supra* (quoting *Milkovich*, 497 U.S. at 1), and "'rhetorical speech' that uses 'loose, figurative, or hyperbolic language' is entitled to *First Amendment* protection and therefore is not actionable." *Id.* (quoting *Snyder*, 580 F.3d at 206).

7. "Five years after the pandemic began, Americans", even elected officials, "largely see COVID-19 through the rear-view mirror." Alec Tyson, Michael Lipka & Claudia Deane, 5 Years Later: America Looks Back at the Impact of COVID-19, "1. Americans' views on COVID-19 risk and the country's response to health emergencies," Pew Research Center, February 12, 2025.

8. "Everyone is entitled to his own opinion but not his own facts". Daniel P. Moynihan, "More Than Social Security," *Washington Post*, January 18, 1983.

9. And, ironically, "'All politics is local' is a phrase coined by Tip O'Neill, the 47th Speaker of the House, and then expanded on by President Biden who wrote, 'all politics is personal.'" Shari Henry, *Tip O'Neill Was Right: The power of local politics*, The Political Librarian (Fall 2024).

10. Today known as the My Lai (Pinkville) Massacre, there had been a "mass killing of as many as 500 unarmed villagers by U.S. soldiers in the hamlet of My Lai on March 16, 1968, and, "[b]y 11:00 am as many as 500 Vietnamese civilians had been killed." Michael Ray, "My Lai Massacre," *Britannica*, February 6, 2026.

11. Not even yet "born [until] March 14, 1989", "Jerrauld Charles Corey Jones. . . is an American politician and attorney currently serving as the 49th attorney general of Virginia since 2026", "the first African American to serve as the attorney general", and he "is the son of former Norfolk Circuit Court judge Jerrauld Jones and Norfolk Juvenile and Domestic Relations District Court judge Lyn M. Simmons." Editors, "Jay Jones," *Wikipedia*, accessed February 17, 2026.

12. While federal regulators had "stopped reporting data on Covid cases in May 2023", "[s]ince the beginning of the pandemic", in the City of Norfolk, with "a toral of 549 reported deaths", "1 in 443 residents", had accrued, Editors, "Tracking Coronavirus in Norfolk, Va.: Latest Map and Case Count," *The New York Times*, March 23, 2023, approximately equivalent to the "553 reported deaths", "1 in 417" that had been accumulated in Richmond, Editors, "Tracking Coronavirus in Richmond, Va.: Latest Map and Case Count," *The New York*

*Times*, March 23, 2023, one third of the nation's capital, where "[t]hrough October 2022, there were 1,400 deaths attributed to COVID-19". Editors, "How did COVID-19 affect people in Washington, DC?" *USA Facts*, accessed February 17, 2026.

13. "Moguldom Nation, aggregating reporting from state media sources, said black Virginians in Richmond were contracting and dying from the coronavirus at a higher rate than other races", and, in 2020, "[t]he online site reported that everyone who had died was black." Donnelle Eller, "Fact check: Black people make up disproportionate share of COVID-19 deaths in Richmond, Virginia," *USA Today*, May 5, 2020.

14. By August 2020, it was known that, in Richmond, "more than 80% of coronavirus cases [we]re Black or Latino, and Latinos ha[d] nearly three times the number of cases than white Richmonders despite being only 7% of the city's population', while 'Black Richmonders [had] account[ed] for more than 60% of the city's deaths". Sabrina Moreno, "Almost 6 months in, Black and Latino residents are still 80% of Richmond's COVID cases. . .", *supra*.

15. "Males and the Hispanic, American Indian and Alaska Native (AIAN) populations experienced a disproportionately large number of deaths from 2019 to 2020, the year that includes the start of the COVID-19 pandemic." Shannon Sabo and Sandra Johnson, "Males and the Hispanic, American Indian and Alaska Native Populations Experienced Disproportionate Increases in Deaths During Pandemic," *Census*, June 22, 2023.

- 6 -

16. "As of June 14, 2023, around 66 percent of all COVID-19 deaths in the United States ha[d] been among non-Hispanic whites, although non-Hispanic whites account for 60 percent of the total U.S. population"; "[o]n the other hand, non-Hispanic Asians ha[d] accounted for just three percent of all deaths due to COVID-19 even though this group makes up almost six percent of the entire U.S. population." A. Minhas, "Distribution of COVID-19 (coronavirus disease) deaths in the United States as of June 14, 2023, by race and ethnicity," *Statista*, November 9, 2025.

17. "Using COVID-19 case data from the Centers for Disease Control and Prevention," to "calculate[] crude and indirect age-adjusted COVID-19 mortality rates for the non-Hispanic White and non-Hispanic Black populations in each of 353 counties for the period February 2, 2020, through January 30, 2021", and "[u]sing linear regression analysis," researchers had "examined the relationship between several county-level measures of structural racism and the observed differences in racial disparities in COVID-19 mortality across counties", and "[n]inety-three percent of the counties in. . . [that] study experienced higher death rates among the Black compared to the White population, with an average ratio of Black to White death rates of 1.9 and a 17.5-fold difference between the disparity in the lowest and highest counties." Michael Siegel, *et al.*, *Actual Racial/Ethnic Disparities in COVID-19 Mortality for the Non-Hispanic Black Compared to Non-Hispanic White Population in 353 US Counties and Their Association with Structural Racism*, 9 J. Racial Ethn. Health Disparities 5, pp.

- 7 -

1697-1725 (August 2021).

18. According to these researchers, "[t]hree traditional measures of structural racism were significantly related to the magnitude of the Black-White racial disparity in COVID-19 mortality rates across counties", *Id.*; however, in science, "[c]orrelation implies association, but not causation", and, "[c]onversely, causation implies association, but not correlation", Naomi Altman & Martin Krzywinski, *Points of Significance: Association, correlation and causation*, 12 Nat. Meth., pp. 899-900, September 29, 2015.

19. It "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned", Fed.R.Evid. 201(b)(2), in conditions precedent, "[b]efore an *EUA* may be issued, the Secretary of HHS must declare that circumstances exist justifying the authorization based on one of four determinations", and he is granted only one authority unto himself, *i.e.*, where "a determination by the Secretary" is made "that there is a public health emergency, or a significant potential for a public health emergency, that affects, or has a significant potential to affect, national security or the health and security of United States citizens living abroad, and that involves a *CBRN agent or agents*, or a disease or condition that may be attributable to such agent or agents." 85 Fed. Reg. 26, February 7, 2020.

20. "If Congress had wanted to authorize" any other conditions, "in any way, it would have said so." *Fischer v. U.S.*, 603 U.S. 480 (2024).

21. It is "capable of accurate and ready determination by resort to sources whose

accuracy cannot reasonably be questioned", Va. S. Ct. R. 2:201(b), that "[t]he term CBRN stands for 'chemical, biological, radiological and nuclear', and relates to specific hazards that may be encountered during an incident", and "[t]he term CBRN is *generally reserved for the deliberate release of a hazardous material such as in a terrorist attack, whereas the term Hazmat is used for accidental release or exposure to toxic industrial material.*" Antony Calder & Steven Bland, *Chemical, biological, radiological and nuclear considerations in a major incident*, 33 Surg. (Oxf.) 9, pp. 442–448, August 6, 2015 (emphasis added).

22. This language, in statement of the problem, is reiterated by every pharmaceutical company that had been issued an *EUA. See* Marion F. Gruber, *Emergency Use Authorization (EUA) for an Unapproved Product Review Memorandum (Pfizer Application 27204)*, "Pfizer-BioNTech COVID-19 Vaccine/ BNT162b2: Dosage Forms/Strengths and Route of Administration: A 0.3 mL Suspension for intramuscular injection", November 20, 2020; Marion F. Gruber, *Emergency Use Authorization (EUA) for an Unapproved Product Review Memorandum (ModernaTX, Inc., Application 27073)*, November 30, 2020; Marion F. Gruber, *Emergency Use Authorization (EUA) for an Unapproved Product Review Memorandum (Janssen Biotech, Inc., Application 27205)*, February 4, 2021; Marion F. Gruber, *Emergency Use Authorization (EUA) for an Unapproved Product Review Memorandum*, "Janssen COVID-19 vaccine (Ad26.COV2.S): Dosage Forms/Strengths and Route of Administration: A 0.5 mL suspension administered as a single intramuscular injection at the dose level of

$5\times10^{10}$ virus particles (vp)", February 4, 2021.

23. Hence, neither Zuckerberg nor Meta can "dispute that COVID-19," often described as "a highly contagious and deadly virus, falls within this definition." Id. *Perez*, Crim. Act. No.: 5:20-CR-283-DAE-1, 2021 WL 4621695, *supra.*

24. Generally, legislative authorities are "presumed to have known. . . the definition and interpretation already attributed to the term[s]". *Branch v. Commonwealth*, 14 Va. App. 836 (Va. Ct. App. 1992).

### Whatever It "Takes"

25. " A liberal dark money organization has launched a $5 million campaign to persuade voters to back the Democrats' redrawn congressional map in an April referendum", and "[t]he effort by Virginians for Fair Elections includes a two-week, $2.7 million ad campaign across the commonwealth's six major TV markets." Kerry Picket, "Outside groups descend on Virginia for redistricting referendum," *Washington Examiner*, February 16, 2026.

26. Currently in a centralized effort, not locally generated,  but on the national level, where "[t]he No Kings protest group has published a map showing the U.S. cities and towns where protests will take place ahead of their next day of action", with "[t]he protest group. . .organizing a day of protests in multiple areas across the U.S. on March 28 against the Donald Trump administration", Kate Plummer, "'No Kings' protest map reveals next nationwide mass mobilization," *Newsweek*, February 20, 2026, "House Minority Leader Hakeem Jeffries *(D-NY)* vowed to back the ballot initiative on Virginia's redistricting plan, saying voters will have 'all of the information necessary' before the vote on April 21." Asher Notheis,

"Democrats will do 'whatever it takes' to pass Virginia redistricting plan, Jeffries says," *Washington Examiner*, February 15, 2026 (emphasis added).

27. However, apparently far from the concerns of national party leaders, focused upon national strategies, in which individual voters are but willing pawns in a larger game, "[pprior to the *Legislative Reorganization Act of 1946*[,] staff rarely topped one or two advisers", and "Members of Congress rely heavily on staff to handle a lot of legislative and constituent correspondence issues." Editors, "Congressional Staff," *Mayfield Schools*, accessed February 21, 2026.

28. "Congress did not allow for the large staffs that exist now until the 1970s", and, "[p]reviously Members relied on a very few selected staff members unless they hailed from a state or district with more than 500,000 residents." *Id.*

29. Today, "Members of the House of Representatives may hire up to 18 permanent employees for their congressional and district offices", and "[e]ach Member is allo[t]ted [only] $748,312 to hire up to 18 staff and four additional temporary, part-time, of shared staff"; however, congressional "[s]taff can not be paid more than $151,974 per year." *Id.*

30. Additionally, "[e]ach Member begins with a base allowance of $187,236 to spend on office expenses", which "may include travel costs, office equipment, district office rental, stationary and office supplies, telecommunications, printing, postage, computer services, and other office-related expenses." *Id.*

31. Most often recruited for "ties to the district", the District Director will be expected to "[o]versee district office operations", "[d]evelop outreach and

constituent service", "[r]epresent Member in meetings and events", "[s]upervise district staff, plan, and assign work", and he or she may also "[o]versee district office budget Manage Member schedule with district scheduler". R. Eric Petersen, "Congressional Staff: Duties and Qualifications Identified by Members of Congress for Selected Positions," *CRS*, May 2, 2025.

32. "The proposal would keep a southern portion of Arlington in the 8th Congressional District, which currently encompasses all of the county and is represented by Rep. Don Beyer (D)", and "[t]his would extend as far south as York County in the Tidewater region." Scott McCaffrey & Emily Leayman, "Proposed congressional maps in Virginia would split Arlington in two," *ARL Now*, February 6, 2026, a distance of almost 200 miles, and up to a three-hour drive.

33. "Our whole constitutional heritage rebels at the thought of giving government the power to control men's minds", *Stanley v. Georgia*, 394 U.S. 557 (1969), and, "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *West Virginia State Bd. of Educ. v. Barnett*, 319 U.S. 624 (1943).

34. "States may regulate. . . in ways rationally related to a legitimate state interest", *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U. S. 483 (1955), just as before any burden may be imposed by the State against any person or any class of

persons in sufferance of their rights, there must be established an "essential nexus," *Nollan v. California Coastal Comm'n*, 483 U.S. 825 (1987).

35. Furthermore, "[w]hen the Supreme Court has invalidated a statute because of an illegitimate purpose, '[i]n each case, the government's action was held unconstitutional only because *openly available data supported a commonsense conclusion that a religious objective permeated the government's action*." *Croft v. Perry*, 604 F. Supp. 2d 932 (N.D. Tex. 2009), *aff'd* 624 F.3d 157 (5th Cir. 2010) (quoting *McCreary County v. ACLU*, 545 U.S. 844 (2005)) (emphasis added).

36. Nonetheless, "[t]he purpose requirement is rarely determinative, 'presumably because government does not generally act unconstitutionally, with the predominant purpose of advancing religion.'" *Id.* (quoting *Ibid.*).

37. Still, "[p]remised on mistrust of governmental power, the *First Amendment* stands against attempts to disfavor certain subjects or viewpoints. *Citizens United*, Record No. 08-205, 558 U.S., at 310 (2010) (citing *U.S. v. Playboy Entertainment Group, Inc.*, 529 U. S. 803 (2000).

38. "The mere fact that. . . [one] may not approve of publications. . . , or may not desire. . . to discuss. . . [another's] activities or publish. . . [another's] spoken words, does not give rise to an action cognizable under the law", and "[t]he *First Amendment* freedoms of speech and press are too precious to be eroded or undermined by the likes and dislikes of persons who invite attention and publicity by their own voluntary actions", *Falwell v. Penthouse Int'l, Ltd.*, 521 F. Supp. 1204 (W.D. Va. 1981).

- 13 -

## Unde Influence

39. To date, only less than 18,000 persons under the age of 20 have died, Staff, "Child mortality and COVID-19," UNICEF (March 2023), https://data.unicef.org/topic/child-survival/covid-19/ (accessed April 22, 2023)[3].

40. Generally, "[t]he offender. . . must only have or create an understanding. . . that he can influence matters in connection with an official duty", and "[w]hether he is capable of actually effecting such an act is irrelevant." *U.S. v. Manzo*, 851 F.Supp.2d 797 (D.N.J. 2012) (citing *State v. Ferro*, 128 N.J.Super. 353 (App.Div.1974)).

41. In criminal law, the task of the court is "to determine whether the record contains enough evidence for the triers of the facts to find beyond a reasonable doubt each element of the offenses involved. *Calley*, 22 U.S.C.M.A. at 534 (citing *U.S. v. Papenheim*, 19 U.S.C.M.A. 203 (1970); *U.S. v Wilson*, 13 U.S.C.M.A. 670 (1963)).

42. In a matter pertaining to "'little defenseless men, women, and kids'", Article III Courts have made it clear, "No, you do not kill women and children"; "You must use common sense." *Calley v. Callaway*, 519 F.2d 184 (5th Cir. 1975).

43. "The distinguishing mark of a 'manifestly unlawful order' should fly like a black flag above the given order, as a warning reading 'Prohibited!'" " *Government of Israel v. Eichmann*, 36 I.L.R. 5 (Supreme Court of Israel, 1961) (quoting *Chief*

---

[3] "Of over 17,400 deaths reported in those under 20 years of age, 52 per cent occurred among adolescents ages 10-19, and 47 per cent among children ages 0-9." *Id.*

*Military Prosecutor v. Melinki, et al.* (13 Pesakim Mehoziim, p. 90)), and "[i]t is to be pointed out here that even the jurists of the Third Reich did not dare to put on paper that obedience to orders is above all". *Id.*

44. "Because of the nature of the offense, an agreement often may only be established by circumstantial and indirect evidence including the overt actions of the parties", *Jones v. Commonwealth*, 279 Va. 295 (2010) (citing *Floyd v. Commonwealth*, 219 Va. 575 (1978), and, accordingly, "[p]roof of an agreement to commit the overall objective of the. . . offense 'may be established solely by circumstantial evidence.'" *Solomon v. Am. Web Loan*, No. 4:17CV145, 2019 WL 1320790, at *1–22 (E.D. Va. Mar. 22, 2019) (quoting *Hecht*, 897 F.2d, at 21).

45. Where, as here, "the defendants having either turned a blind eye to what was happening or themselves introduced policies that they knew would lead to these harms even though the defendants knew the plaintiffs had no connections", a showing of "'deliberate indifference', *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017) (Breyer, J. and Ginsburg, J. dissenting) (quoting *Turkmen v. Hasty*, 789 F.3d 218 (2015) (panel decision); *c.f. Estelle v. Gamble*, 429 U.S. 97 (1976)[4]), and, where defendants are "willfully blind to a harm caused", can trigger due process violation concerns. *Id.* "The Eleventh Circuit has defined 'custom' as 'a practice that is so settled and permanent that it takes on the force of law' or a 'persistent and wide-spread practice.'" *Lawshe v. Hardwick*, 3:24-cv-44-MMH-MCR (M.D. Fla. Oct. 29, 2024) (quoting *Sewell v. Town of Lake Hamilton*, 117 F.3d 488 (11th

---

[4] Showing "deliberate indifference to serious medical needs." *Id.*

Cir. 1997)).

46. "Section 1584 prohibits a person from 'knowingly and willfully hold[ing] to

involuntary servitude . . . any other person for any term'", *U.S. v. Djoumessi*,

538 F.3d 547 (6th Cir. 2008) (quoting 18 U.S.C. § 1584), and, "[a]s used in this

section,

> the term "involuntary servitude" necessarily means a condition of servitude
> in which the victim is *forced to work for the defendant* by the use or threat of
> physical restraint or physical injury, *or by the use or threat of coercion
> through law or the legal process*. This definition encompasses those cases in
> which the defendant holds the victim in servitude by placing the victim in
> fear of such physical restraint or injury or legal coercion. *Id.* (quoting *U.S. v.
> Kozminski*, 487 U.S. 931 (1988) (emphasis added).

47. "A § 1584 conviction thus requires proof that the defendant intentionally held

the victim in service against her will in one of three ways: (1) by physical

restraint or force, (2) by legal coercion or (3) by threats of physical force *or legal

coercion*", *Id.* (citing *U.S. v. Alzanki*, 54 F.3d 994 (1st Cir. 1995)) (emphasis

added), and, "[i]n assessing whether these things happened, the trier of fact may

consider '*the vulnerabilities of the victim*' as well as 'evidence of other means of

coercion or of extremely poor working conditions.'" *Id.* (quoting *Kozminski*, 487

U.S. at 931) (emphasis added).

48. Undue influence is "never presumed", and "[t]he burden of showing undue

influence rests upon him who alleges it, and it cannot be based upon bare

suggestion, innuendo, or suspicion." *Jenkins v. Trice*, 152 Va. 411 (1929).

49. "The undue influence which will vitiate. . . must be of such character as to

control the mind and direct the action of the testator", *Id.* (citing *Core v. Core's

Adm'rs*, 139 Va. 1 (1924)

50. For purposes of granting a personnel security clearance, "[c]onduct involving questionable judgment, untrustworthiness, unreliability, lack of candor, dishonesty, or unwillingness to comply with rules and regulations could indicate that the person may not properly safeguard classified information."32 CFR § 147.7.

51. Most especially, "[a] security risk may exist when an individual's immediate family, including cohabitants and other persons to whom he or she may be bound by affection, influence, or obligation are not citizens of the United States or may be subject to duress." 32 CFR § 147.4(a).

52. "These situations could create the potential for foreign influence that could result in the compromise of classified information", and "[c]ontacts with citizens of other countries or financial interests in other countries are also relevant to security determinations if they make an individual potentially vulnerable to coercion, exploitation, or pressure." *Id.*

53. Yet, "[f]rom March 2020 through September 2022", "212 representatives and senators had COVID-19 according to public reports of either a positive test or a diagnosis from symptoms, one of whom [had] died due to COVID-19; some were diagnosed multiple times." Editors, "COVID-19 in Congress," *GovTrack*, August 29, 2025.

54. "In the early part of the pandemic before testing was widely available and routinely used, many legislators reported exposure and self-quarantine: Overall, 250 representatives and senators either were diagnosed with COVID-19, self-

- 17 -

quarantined after exposure to COVID-19, or reported exposure but took other action or no action — some multiple times", *Id.*, credible indicia that 46.7% of the elected members of Congress had been infected by "a CBRN agent or agents." 85 Fed. Reg. 26, *supra.*

55. Federal law enforcement define "international terror" as "[v]iolent, criminal acts committed by individuals and/or groups who are inspired by, or associated with, designated foreign terrorist organizations or nations (state-sponsored)", and define "domestic terrorism" as "[v]iolent, criminal acts committed by individuals and/or groups to further ideological goals stemming from domestic influences, such as those of a political, religious, social, racial, or environmental nature." Staff, "What We Investigate," *FBI*, https://www.fbi.gov/investigate/terrorism (accessed May 5, 2022).

56. While in some jurisdictions, a party may be found to have just engaged in "aiding and abetting a breach of fiduciary duty", *Alpert v. Riley*, 2009 WL 1226767 (S.D. Tex. April 30, 2009), in the Commonwealth of Virginia, "[a]iding and abetting is a criminal concept and not a civil concept", *A.G. Van Metre Const., Inc. v. NVKettler L.P.*, No. 13174 , In Chancery, 1992 WL 884467 (Va. Cir. Ct. January 29, 1992).

57. Nonetheless a "Court recites the facts 'in the light most favorable to the government and draw[s] all reasonable inferences in its favor.'" *U.S. v. Zodhiates*, 235 F.Supp.3d 439 (2017) (quoting *U.S. v. Guadagna*, 183 F.3d 122 (2d Cir. 1999).

58. Moreover, "when the Government proves an element of a crime circumstantially—as it must almost always do when it proves a defendant's intent—the Government 'need not 'exclude every reasonable hypothesis other than that of guilt.''" *Id.* (quoting *Ibid.* (quoting *Holland v. U.S.*, 348 U.S. 121 (1954)).

59. Furthermore, "when the Government offers circumstantial evidence of intent from which a reasonable jury could find the defendant guilty beyond a reasonable doubt—as the Government did in this case—Rule 29 does not permit the Court to set aside the jury's view of that evidence." *Id.*

60. In some jurisdictions, a defendant may also be charged as "a principal in the second degree or as an accessory before the fact", *U.S. v. Local 560, Intern. Broth. of Teamsters, Chauffeurs, Warehousemen, and Helpers of America*, 581 F. Supp. 279 (D.N.J. 1984), aff'd, 780 F.2d 267 (3d Cir. 1985), and, in the Commonwealth of Virginia, he may be charged as accessory to murder, a violation of Va. Code § 18.2-32, chargeable to accessories under Va. Code § 18.2-19.

61. On similar facts, one tribunal considering crimes against humanity had concluded that "[t]he excuse given by the Accused in his evidence (Session 81, Vol. IV, p. xxxx5), that all he did was to pass on a message which he received from Cracow, is not plausible," concluding that "undoubtedly he knew the value of the tale about 'administration of tonics,' to which he put his signature." *Eichmann*, 36 I.L.R. at 5.

62. Even a soldier "must use common sense", *Callaway*, 519 F.2d at 184, and "[t]he acts of a subordinate done in compliance with an unlawful order given him by his superior are excused and impose no criminal liability upon him unless the superior's order is one which a man of ordinary sense and understanding would, under the circumstances, know to be unlawful, or if the order in question is actually known to the accused to be unlawful." *Calley*, 22 U.S.C.M.A. at 534.

## Jurisdiction and Venue

63. "A pleading that states a claim for relief *must* contain. . . a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support". Fed. R. Civ. P. 8(a)(1).

64. This Court possesses "original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between. . . citizens of different States", and some Respondents are residents of a different state, in a matter involving a claim in which even the statutorily accrued settlement amount, 18 U.S.C. § 248(c)(1)B), exceeds the diversity threshold.

65. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action against some Respondents arises under the laws of the United States and the *Declaratory Judgment Act*, 28 U.S.C. § 2201, against others under the *Freedom of Access to Clinic Entrances (FACE) Act*, 18 U.S.C. § 248(a)(2), and against others under the *Voting Rights Act of 1965*, 52 U.S.C. § 10101 *et seq*.

66. Moreover, with respect to voting rights, "under *Wilkins*, residency, without more,

only confers standing in one particular situation: where the claim is based on racial gerrymandering", and, "[i]n the absence of such a claim, a plaintiff must demonstrate an injury in fact in order to have standing." *Howell v. McAuliffe*, 292 Va. 320 (2016) (citing *Wilkins v. West*, 264 Va. 447 (2002)).

67. "'Unless such evidence is present, that plaintiff would be asserting only a generalized grievance against governmental conduct of which he or she does not approve.'" *Ibid.* (quoting *U.S. v. Hays*, 515 U.S. 737 (1995)).

68. Venue therefore, is proper, with respect to Webb, because it is "a judicial district in which a substantial part of the events. . . giving rise to the claim [had] occurred". 28 U.S.C. § 1391(b)(2), while Webb is "a natural person," who "shall be deemed to reside in the judicial district in which that person is domiciled", 28 U.S.C. § 1391(c)(1).

69. Venue is proper, with respect to most Respondents, because most Respondents are "subject to the court's personal jurisdiction with respect to such action". 28 U.S.C. § 1391(b)(3).

70. Venue is proper with respect to remaining Respondents, because, remaining Respondents include "an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, or the United States", and "a substantial part of the events or omissions giving rise to the claim [had] occurred, or a substantial part of property that is the subject of the action is situated" in this jurisdiction. 28 U.S.C. § 1391(g)(1).

## Claims

71. "[N]othing short of clairvoyance would have enabled [anyone]. . . to anticipate that this Court, or any court, would approve dismissal of this case". *Link v. Wabash R. Co.,* 370 U.S. 626 (1962).

72. "A pleading that states a claim for relief *must* contain", at a minimum "a short and plain statement of the claim showing that the pleader is entitled to relief", Fed. R. Civ. P. 8(a)(2), and most "especially a *pro se* complaint[]", as here, "should not be dismissed summarily *unless* 'it appears '*beyond doubt* that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief'". *Gordon v. Leeke,* 574 F.2d 1147 (4th Cir. 1978) (quoting *Haines v. Kerner,* 404 U.S. 519 (1972)) (quoting *Conley v. Gibson,* 355 U.S. 41 (1957)).

73. "Courts apply a flexible standard when considering a challenge to a state's election law". *Constitution Party of Virginia v. Virginia State Board of Elections,* 472 F.Supp.3d 285 (E.D.Va. July 15, 2020) (citing *Burdick v. Takushi,* 504 U.S. 428 (1992)).

74. Webb, who has "floated around the periphery of the Northern Virginia political scene for nearly the past decade", Scott Brodbeck, "Morning Notes: Candidate Adds Military Rank to His Name," *ARL Now,* June 10, 2021, "[i]n a district where 48 percent of residents are minorities", Megan Flynn, "Don Beyer's first primary challenger asks him to 'pass the torch'," *Washington Post*, April 24, 2022, presents two distinct but still related issues.

75. The first bundle of claims arises from a retaliatory action, including a violation of the *Hatch Amendment* to the *Freedom of Access to Clinic Entrances (FACE*

*Act*, 18 U.S.C. § 248(a)(2), and involving the permanent disabling of the Facebook account, and access to a Candidate page with over 1,500 followers, administered by the requester for OMB *FOIA* No. 21-220, on July 19, 2021, by Bezos and Meta, just four days after "White House press secretary Jen Psaki [had] admitted her colleagues were 'flagging problematic posts for Facebook that spread disinformation'", Shannon Thaler, "Facebook removed COVID-19 posts, bowing to White House pressure: report," *New York Post*, July 28, 2023.

76. The second bundle of claims arises from the "House Minority Leader Hakeem Jeffries'. . . vow[]to back the ballot initiative on Virginia's redistricting plan, saying voters will have 'all of the information necessary' before the vote on April 21", Asher Notheis, "Democrats will do 'whatever it takes' to pass Virginia redistricting plan, Jeffries says," *Washington Examiner*, February 15, 2026, noting, *inter alia*, that the "political question doctrine in this context should make clear, the interpretation of the apportionment provisions of the *Constitution* is. . . [not] within the competence of the Judiciary." *Dep't of Commerce v. Montana*, 503 U.S. 442 (1992) (citing *Davis v. Bandemer*, 478 U.S. 109 (1986); *Baker v. Carr*, 369 U.S. 186 (1962); *Gilligan v. Morgan*, 413 U.S. 1 (1973)).

### *Count One: Procedural Due Process*

77. Webb avers, as detailed in the supporting affidavit on voting rights violations, with respect to the voting officials and State Attorney General,  claims arising in violations of procedural due process, having had a statutorily conferred right, to solicit petitions to qualify for the November ballot as an independent candidate

infringed by the recent and patently political question involving gerrymandering the congressional districts outside the constitutionally authorized apportionment cycle.

78. "Procedural due process. . . extends potentially to any statutorily conferred benefit, whether or not it can be properly construed as a liberty or property interest", *Dilbert v. Newsom*, Case No. C096274 (Cal. Ct. App. Apr. 8, 2024) (citation omitted), "[b]ut, 'it still requires the deprivation of some statutorily conferred benefit before it is implicated'". *Id.* (quoting *Ibid.*).

79. "While '[a] state-created right can, in some circumstances, beget yet other rights to procedures essential to the realization of the parent right . . ., the underlying right must have come into existence before it can trigger due process protection.'" *Id.*

80. Merely "[c]irculating ballot petitions is protected speech under the *First Amendment*", *Norfolk 2nd Amendment Preservation Coalition*, 106 Va. Cir.at 215 (citing *Meyer v. Grant*, 486 U.S. 414 (1988)), and "[w]hen a *First* or *Fourteenth Amendment* right is subject to severe restrictions, the regulation must be narrowly tailored to farther a compelling state interest." *Id.* (citing *Burdick*, 504 U.S. at 428).

81. "The loss of *First Amendment* freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury", *Doe v. Tangipahoa Par. Sch. Bd.*, 631 F. Supp. 2d 823 (E.D. La. 2009) (quoting *Elliott v. Burns*, 427 U.S. 347 (1976)), warranting injunctive relief.

- 24 -

82. Any "innocent individual who is harmed by an abuse of governmental authority is assured that he will be compensated for his injury." *Owen v. City of Independence*, 445 U.S. 622 (1980).

### *Count Two: Voting Rights Act*

83. Federal law prohibits the use of any "test or device", 52 U.S.C. § 10501(a), which is defined as "any requirement that a person as a prerequisite for voting", *inter alia*, to "demonstrate the ability to read, write, understand, or interpret any matter" or "demonstrate any educational achievement or his knowledge of any particular subject". 52 U.S.C. § 10501(b)(1) and (2).

84. While, indeed, 42% of Arlington residents, age 25 and older, hold at least a graduate degree, "billed as the most educated city in the U.S., in a Forbes analysis, thanks to 76% of adults 25 and older holding a bachelor's degree", Cuneyt Dil, "Arlington is the most educated city in the country, study finds," *Axios*, October 26, 2023, "[d]ue to their lower levels of literacy and education, minority voters are more likely to be unaware of [even] certain technical rules, such as the requirement that early ballots be received by the county recorder", *Democratic Nat'l Comm. v. Reagan* 329 F. Supp. 3d 824 (D. Ariz. 2018).

85. And "[p]eople of color make up 41% of the Arlington population." Staff, "Diversity & Inclusivity," *Arlington*, https://www.arlingtoneconomicdevelopment.com/Life-in-Arlington/Diversity-Inclusivity (accessed September 10, 2025), and "[i]n this enclave of left-leaning affluence a few miles from the U.S. Capitol," Paul Schwartzman, "After his political resurrection, candidate Beyer adopts high-minded approach,"

*Washington Post*, June 28, 2014, it should be surprising that there is no sense of community outrage even after "Forbes [had] noted a racial gap in bachelor's degrees, with 10.5% of non-white residents holding degrees." Cuneyt Dil, "Arlington is the most educated city in the country, study finds," *supra*.

86. Under federal law, "[t]he *extent to which members of a protected class have been elected to office* in the State or political subdivision is one circumstance which may be considered", 52 § 10301(b), and "[a] violation of subsection A is established if, on the basis of the totality of circumstances, it is shown that the political processes leading to nomination or election in the state or a locality are not equally open to participation by members of a protected class in that its members have less opportunity than other members of the electorate to participate in the political processes or to elect representatives of their choice." § 24.2-126(B)..

87. In the Commonwealth of Virginia, "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by the state or any locality in a manner that results in a denial or abridgement of the right of any citizen of the United States to vote based on race or color or membership in a language minority group", Va. Code § 24.2-126(A), and "[a] violation of subsection A is established if, on the basis of the totality of circumstances, it is shown that the political processes leading to nomination or election in the state or a locality are not equally open to participation by members of a protected class in that its members have less opportunity than

other members of the electorate to participate in the political processes or to elect representatives of their choice." § 24.2-126(B).

88. Further, "[t]he extent to which members of a protected class have been elected to office in the state or locality is one circumstance that may be considered", *Id.*, and, Petitioner resides "[i]n a district where 48 percent of residents are minorities". Megan Flynn, "Don Beyer's first primary challenger asks him to 'pass the torch'," *Washington Post*, April 24, 2022.

89. Yet, with early in-person voting beginning on March 6 to April 18, 2026, and the deadline for applying for an absentee ballot has been set for April 10, 2026, Staff, "Upcoming Elections," *VaDeptElec*, accessed February 23, 2026, and an "[e]xplanation [that] will be provided soon", Staff, "Proposed Amendment for April 2026 Special Election," *VaDeptElec*, accessed February 23, 2026, these challenged voters are put to the test to determine whether they wish to dilute a congressional district that is "kiss your sister close" to becoming a majority-minority congressional district, and, with the vast majority of minority voters being loyal Democrat voters, there exists an unconscionable inference of undue influence.

90. Under federal law, "[w]henever. . . an aggrieved person institutes a proceeding under any statute to enforce the voting guarantees of the *[F]ourteenth* or *[F]ifteenth [A]mendment* in any State or political subdivision *the court shall authorize* the appointment of Federal observers by the Director of the Office of Personnel Management", 52 U.S.C. § 10302(A).

### *Count Three: Facial Challenge*

91. Webb avers that, read *in pari materia* with the *Apportionment Clause*, while the Legislature enjoys the power to "regulate the time, place, manner, conduct, and administration of primary, general, and special elections, and shall have power to make any other law regulating elections *not inconsistent with this Constitution*", *Va. Const.*, art II, § 4, federal preemption restricts the range of this enactment, rendering unconstitutional an off-cycle redistricting, especially when tainted by a purely political motive.

92. While certainly one "cannot be expected to disclose *facts of which he is ignorant*", *Gen'l Reinsur. Corp. v. Southern Sur. Co. of Des Moines, Iowa*, 27 F.2d 265 (1928) (quoting 2 *Cooley's Briefs on Insurance*, p. 1206) (emphasis added), consideration may be warranted for "an exception to the 'mistake of law is not an excuse' rule", in which "[t]he quintessential examples. . . were individuals acting in reliance on a statute later held to be unconstitutional or on a court decision that a statute is unconstitutional that is subsequently overruled." *U.S. v. North*, 910 F.2d 843 (1990) (citing *U.S. v. Barker*, 546 F.2d 940 (D.C.Cir.1976)).

93. Proponents, however, do not attempt to "even claim that. . . [they had] relied on *any* 'conclusion or statement of *law*,' let alone one 'issued by an official charged with interpretation, administration, and/or enforcement responsibilities in the relevant legal field'", *Id.* (citing *Ibid.*), and, "[r]espectfully, each argument is wrong." *Comm. on Judic. v. McGahn*, 951 F.3d 510 (2020).

### *Count Four: As-Applied Challenge*

94. Webb avers that, as applied, the redistricting measure also fails, at least with

- 28 -

respect to Virginia's 8th Congressional District reaching a point where "48 percent of residents are minorities", Megan Flynn, "Don Beyer's first primary challenger asks him to 'pass the torch'," *supra*,  and where the voters "usually provide the margin of victory for Democrats who win statewide", Patricia Sullivan, "Arlington County Democrats continue to dominate region's politics," *supra*, the legislature, at least ostensibly taking cues from party leaders in Washington, *see* Asher Notheis, "Democrats will do 'whatever it takes' to pass Virginia redistricting plan, Jeffries says," *supra*, the legislature is rushing to pass a congressional district map to reconfigure Virginia's 8th Congressional District to "extend as far south as York County in the Tidewater region." Scott McCaffrey & Emily Leayman, "Proposed congressional maps in Virginia would split Arlington in two," *supra*, an unconscionable effort in undue influence, given the lower education of minority voters, with only token representation in the government, and a patently illegitimate motive, not authorized under the *Virginia State Constitution.*

95. "Everyone is entitled to his own opinion but not his own facts". Daniel P. Moynihan, "More Than Social Security," *Washington Post*, January 18, 1983.

96. And, ironically, "'All politics is local' is a phrase coined by Tip O'Neill, the 47th Speaker of the House, and then expanded on by President Biden who wrote, 'all politics is personal.'" Shari Henry, *Tip O'Neill Was Right: The power of local politics*, The Political Librarian (Fall 2024).

97. The incumbent in this district, because of its recognized power, had been the

heir apparent to a potentially vacated seat in the U.S. Senate in 2016, Katherine Frey, "If Kaine becomes vice president, McAuliffe can fill his Senate Seat," *Washington Post*, July 23, 2016.and this raises at least a reasonable inference of motive, means and opportunity. *Bowen v. Maynard*, 799 F.2d 593 (10th Cir.1986)[5].

98. "Maps from Georgia, Alabama, Louisiana, North and South Carolina ALL have been sued for racial gerrymandering, mainly due to not drawing enough majority-Black districts in accordance with the *Voting Rights Act*", and "[w]hen accepting to hear these racial gerrymandering cases, SCOTUS put a stay on lower court rulings that demanded states draw new, fairer maps." Justin Brown, "Majority-Minority Districts: The Black Belt," *Battleground*, June 28, 2023.

99. Casting the concerns of the local voters aside, legislators, pursuing a national political strategy subordinate even the contact a voter might have with their Member's congressional district office, which could represent a three-hour drive for a resident to travel from the Tidewater to Northern Virginia to seek constituent services in Virginia's 8th Congressional District alone.

### *Count Five: Civil and Business Conspiracy to Commit Fraudulent Concealment*
#### *Conspiracy*

100. "Any person who. . . purchas[es] or sell[s] a security while in possession of material, *nonpublic information* shall be liable. . . to any person who,

---

[5] "Additionally, there was no evidence that 'Slick,' unlike Crowe, had motive, opportunity, and ability to kill the bartender." *Id.*

contemporaneously with the purchase or sale of securities. . . has purchased. . . or sold. . . securities of the same class", 15 U.S.C. § 78t-1(a) (emphasis added); however, "[n]o action may be brought under this section more than 5 years after *the date of the last transaction* that is the subject of the violation." 15 U.S.C. § 78t-1(b)(4) (emphasis added).

101.  For purposes of standing, Article III Courts have defined an injury-in-fact as "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992)).

102.  "The proximate-cause inquiry is not easy to define, and over the years it has taken various forms; but courts have a great deal of experience applying it, and there is a wealth of precedent for them to draw upon in doing so." *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) (citing *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830 (1996); *Pacific Operators Offshore, LLP v. Valladolid,* 132 S.Ct. 680 (2012) (Scalia, J., concurring in part and concurring in judgment)).

103.  "Proximate-cause analysis is controlled by the nature of the statutory cause of action", and "[t]he question it presents is whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits." *Id.*

104.  "Put differently, the proximate-cause requirement generally bars suits for alleged harm that is 'too remote' from the defendant's unlawful conduct", and "[t]hat is ordinarily the case if the harm is purely derivative of 'misfortunes

visited upon a third person by the defendant's acts.'" *Id.* (citing *Holmes v. Sec. Invest. Protect. Corp.,* 503 U.S. 258 (March 24, 1992); *see, e.g., Hemi Group, LLC v. City of New York,* 559 U.S. 1 (2010)).

105.    "In a sense, of course, all commercial injuries from false advertising are derivative of those suffered by consumers who are deceived by the advertising; but since the *Lanham Act* authorizes suit only for commercial injuries, the intervening step of consumer deception is not fatal to the showing of proximate causation required by the statute." *Id.* (citing *Harold H. Huggins Realty, Inc. v. FNC, Inc.,* 634 F.3d 787 (5th Cir. 2011)).

106.    "That is consistent with our recognition that under common-law principles, a plaintiff can be directly injured by a misrepresentation even where 'a third party, and not the plaintiff, ... relied on' it." *Id.* (citing *Bridge v. Phoenix Bond & Indemnity Co.,* 553 U.S. 639 (2008)).

107.    "Any two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of (i) willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever or (ii) willfully and maliciously compelling another to do or perform any act against his will, or preventing or hindering another from doing or performing any lawful act, shall be jointly and severally guilty of a Class 1 misdemeanor", and "[s]uch punishment shall be in addition to any civil relief recoverable under § 18.2-500." Va. Code § 18.2-499(A).

108.    In the present matter, "the averred fact of knowledge of the peril stated was

absolutely essential", all heard, or should have "heard three or four short, shrill whistles, one right after the other", just as all knew or should have known that "the blasts" are not made without reason. *St. Louis & S. F. R. Co. v. Model Laundry*, 42 Okla. 501 (June 20, 1918).

109.   "In this case, the defendants were, at least, on constructive notice regarding the condition. . . , as an owner/occupier is generally on constructive notice of what a reasonable inspection would reveal." *Hagadorn v. Prudential Ins. Co.*, 267 Ga. App. 143 (Ga. Ct. App. 2004).

110.   "Any person who attempts to procure the participation, cooperation, agreement or other assistance of any one or more persons to enter into any combination, association, agreement, mutual understanding or concert prohibited in subsection A of this section shall [also] be guilty of a violation of this section and subject to the same penalties set out in subsection A." Va. Code § 18.2-499(B).

111.   "Any person who shall be injured in his reputation, trade, business or profession by reason of a violation of § 18.2-499, may sue therefor and recover three-fold the damages by him sustained, and the costs of suit, including a reasonable fee to plaintiff's counsel, and without limiting the generality of the term, 'damages' shall include loss of profits." Va. Code § 18.2-500(A).

112.   "Whenever a person shall duly file a civil action in the circuit court of any county or city against any person alleging violations of the provisions of § 18.2-499 and praying that such party defendant be restrained and enjoined from

continuing the acts complained of, such court shall have jurisdiction to hear and determine the issues involved, to issue injunctions *pendente lite* and permanent injunctions and to decree damages and costs of suit, including reasonable counsel fees to complainants' and defendants' counsel." Va. Code § 18.2-500(B).

113.    "Under Virginia law, the elements of a common law civil conspiracy are (i) an agreement between two or more persons (ii) to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means, which (iii) results in damage to plaintiff through an overt action done pursuant to the agreement", *Marcantonio v. Dudzinski*, 155 F. Supp. 3d 619 (W.D. Va. 2015) (citing *William v. AES Corp.*, 28 F.Supp.3d 553 (E.D.Va.2014)), and "[t]here must also be an underlying tort committed." *Id.* (citing *William,* 28 F.Supp.3d, at 553).

*Unlawful Purpose or Act in Tortious Interference*

114.    "[I]f a contract is terminable at will or involves only a contract or business expectancy, 'a plaintiff, in order to present a *prima facie* case of tortious interference, must allege and prove not only an intentional interference ..., but also that the defendant employed "improper methods," *Dunlap v. Cottman Transmission Sys., LLC,* 287 Va. 207, 754 S.E.2d 313, (2014), wholly eliminating the language regarding probability of pecuniary enrichment.

115.    Under the revised and abbreviated test, "the existence of a valid contractual relationship or business expectancy," *Id.,* as well as the "knowledge of the relationship or expectancy on the part of the interferor," *Id,* are assumed to prove the fact of the matter of an interference, while the "intentional interference inducing or causing a breach or termination of the relationship or

- 34 -

expectancy," *Id.*, is essentially the restated test.

116.    The business expectancy was first applied to an entity without a pecuniary

expectancy in *United Kosher Butchers Ass'n v. Associated Synagogues of Greater*

*Boston, Inc.*, 349 Mass. 595, 211 N.E.2d 332 (Sup. Jud. Ct., 1965), recognizing

the property, *vis* contractual, right in the expectancy and warranting the

differing statutes of limitations for tortious interference with a contract, or two

years, juxtaposed to a business expectancy, for which, in the Commonwealth, the

statute of limitations tolls at five years. *Dunlap*, 287 Va., at 207, 754 S.E.2d, at

313.

117.    Similarly, political organizations have been included as potential parties

under the federal racketeering statute, *see Lopez v. Pastrick*, No. 205-CV-452,

2007 WL 1042140, at *1–6 (N.D. Ind. Apr. 4, 2007).

118.    "It is 'capable of accurate and ready determination by resort to sources

whose accuracy cannot reasonably be questioned', Va.S.Ct.R. 2:201(a)(2), that

the pandemic emergency had been declared, on February 4, 2020, to address not

an infectious disease but rather 'a CBRN agent or agents, or a disease or

condition that may be attributable to such agent or agents", 85 Fed. Reg. 63,

*supra*), which was later determined, upon Webb's initiative, on May 30, 2021, as

in evidence at Exhibit **A**, to have been a "chimeric virus", "a regulatory first",

when added "to the select agents and toxins list". Elizabeth W. Wells & Michael

T. Parker, *Chimeric Viruses Containing Select Agents: The Biology Behind Their*

*Creation, Attenuation, and Exclusion From Regulation*, 21 Health Secur. 5, pp.

384-391 (September-October 2023), *Epub.* September 13, 2023).

119.    "The term CBRN stands for 'chemical, biological, radiological and nuclear',
and relates to specific hazards that may be encountered during an incident', and
'[t]he term CBRN is generally reserved for the deliberate release of a hazardous
material such as in a terrorist attack, whereas the term Hazmat is used for
accidental release or exposure to toxic industrial material." Antony Calder &
Steven Bland, *Chemical, biological, radiological and nuclear considerations in a
major incident*, 33 Surg. (Oxf.) 9, pp. 442—448,. August 6, 2015.

120.    Hence, neither Zuckerberg nor Meta can "dispute that COVID-19," often
described as "a highly contagious and deadly virus, falls within this definition."
Id. *Perez*, Crim. Act. No.: 5:20-CR-283-DAE-1, 2021 WL 4621695, *supra.*

121.    Moreover, "[t]he working definition of the term 'chimera's a new hybrid
microorganism created by joining nucleic acid fragments from two or more
different microorganisms in which each of at least two of the fragments contain
essential genes necessary for replication", Richard E. Hill, Jr., *Center for
Veterinary Biologics Notice No. 05-23*, December 8, 2005, consistent with the
determination by federal regulators, as early as February 4, 2020, that "there is
a public health emergency that has a significant potential to affect national
security or the health and security of United States citizens living abroad and
that involves a novel (new) coronavirus (nCoV) first detected in Wuhan City,
Hubei Province, China in 2019 (2019-nCoV)." 85 Fed. Reg. 26, *supra.*

122.    "Before an *EUA* may be issued, the Secretary of HHS must declare that

circumstances exist justifying the authorization based on one of [only] four determinations". 85 Fed. Reg. 26, *supra*.

123.    While the Defense Secretary (SECDEF) and Homeland Security Secretary (DHS) both hold an original classification authority (OCA) up to Top Secret", 75 Fed. Reg. 2, December 29, 2009), a designation that "shall be applied to information, the unauthorized disclosure of which reasonably could be expected to cause exceptionally grave damage to the national security that the original classification authority is able to identify or describe," E.O. 12,958, *Classified National Security Information*, Sect. 1.3(a)(1), April 17, 1995, and may issue an *EUA*, they did not exercise this discretionary authority.

124.    However, the HHS Secretary possesses OCA only up to "Secret", 75 Fed. Reg. 2, *supra*, a designation that "shall be applied to information, the unauthorized disclosure of which reasonably could be expected to cause serious damage to the national security that the original classification authority is able to identify or describe", E.O. 12,958, *Classified National Security Information*, Sect. 1.3(a)(2), *supra*, and, "[i]f those grounds are inadequate, a court may remand for the agency to... offer 'a fuller explanation of the agency's reasoning at the time of the agency action." *DHS v. Regents of University of California*, 591 U.S.1 (2020) (quoting *Pension Benefit Guaranty Corporation v. LTV Corp.*, 496 U.S. 633 (1990)).

125.    The Health and Human Services Secretary, pursuant to Section 564, can only issue an *EUA*, when "there is a public health emergency, or a significant

potential for a public health emergency, that affects, or has a significant

potential to affect, national security or the health and security of United States

citizens living abroad, and that involves a CBRN agent or agents, or a disease or

condition that may be attributable to such agent or agents." 85 Fed. Reg. 26,

*supra*, and "the traditional rule [dictates] that ignorance of the law is no excuse;

knowledge that the conduct is unlawful is all that is required'". *U.S. v. Trevino*,

CR 2:23cr0066 RB (D.N.M. Apr. 23, 2024) (citing *Bryan v. U.S.*, 524 U.S. 184

(1998)).

### *Overt Action*

126.    "Facebook [had] announced in February [2021] it had expanded the list of

misleading health claims that it would remove from its platforms to include

those asserting that "COVID-19 is man-made or manufactured." Cristiano Lima,

"Facebook no longer treating 'man-made' Covid as a crackpot idea," *Politico*, May

26, 2021.

127.    "If the management knows that certain facts will necessarily prevent the

regulatory approval ... and conceals these facts from the investing public, then

there is scienter." *In re Chembio Diagnostics, Inc. Securities Litigation*, 586

F.Supp.3d 199 (2022) (citing *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453

(S.D.N.Y. 2008), *aff'd sub nom. State Univ. Ret. Sys. of Ill. v. Astrazeneca PLC*,

334 F. Appx 404 (2d Cir. 2009) (summary order).

128.    "If, on the other hand, 'the management of the company [only] releases

positive reports about the drug to the public along the way which the

management honestly believes to be true, and where there is no reckless

disregard for truth, then that is not securities fraud.'" *Id.* (quoting *Ibid.* (collecting cases)).

129.    "The tech giant has updated its policies against false and misleading coronavirus information, including its running list of debunked claims, over the course of the pandemic in consultation with global health officials." Cristiano Lima, "Facebook no longer treating 'man-made' Covid as a crackpot idea," *supra.*

130.    Contemporaneously, according to Zuckerberg and Meta, "we are expanding our efforts to remove false claims on Facebook and Instagram about COVID-19, COVID-19 vaccines and vaccines in general during the pandemic", and, "[s]ince December, we've removed false claims about COVID-19 vaccines that have been debunked by public health experts." Staff, "Removing More False Claims About COVID-19 and Vaccines", *supra.*

131.    In February 2021, "following consultations with leading health organizations, including the World Health Organization (WHO)," Meta had announced that they were "expanding the list of false claims we will remove to include additional debunked claims about the coronavirus and vaccines", to include that "COVID-19 is man-made or manufactured", that "[v]accines are not effective at preventing the disease they are meant to protect against", and that "[i]t's safer to get the disease than to get the vaccine.

132.    Moreover, "a defendant is presumed to continue his involvement in a conspiracy unless he makes a substantial affirmative showing of 'withdrawal, abandonment, or defeat of the conspiratorial purpose,'" *U.S. v. Heard*, 709 F.3d

413 (5th Cir. 2013) (quoting *U.S. v. Mann*, 161 F.3d 840 (5th Cir.1998) (quoting

*U.S. v. Puig–Infante*, 19 F.3d 929 (5th Cir.1994), while "[m]ere cessation of

activity in furtherance of the conspiracy is not sufficient to show withdrawal."

*Id. (citing  Torres*, 114 F.3d at 520 (citing *Phillips*, 664 F.2d at 971).

133.    "By email of March 23, 2021, OMB [had] acknowledged receipt of. . . [a]

request and assigned it tracking number 21-220". Walsh Decl., p. 2, ¶ 3, *Webb v.*

*EOP*, Civil Action No. 1:23-cv-00816 (D.D.C. August 29, 2024)

134.    "OMB[, independently, had] interpreted plaintiff's request as seeking all

OMB records pertaining to any determination that either the infectious dose or

secondary attack rate of COVID-19 (or its corresponding virus, SARS-CoV-2)

[had] warranted classification at the Confidential", Walsh Decl., p. 3, ¶ 7, *supra*,

a designation that "shall be applied to information, the unauthorized disclosure

of which reasonably could be expected to cause damage to the national security

that the original classification authority is *able to identify or describe*", E.O.

12,958, *Classified National Security Information*, Sect. 1.3(a)(3), *supra*

(emphasis added), potentially "an unprecedented scandal at the highest levels of

government, for most of the defendants had held major positions in the. . .

administration", *U.S. v. Haldeman*, 559 F.2d 31 (D.C. Cir. 1976).

135.    In a matter commenced on July 7, 2021, under the *Freedom of Information*

*Act (FOIA)*, 5 U.S.C. § 552, the Federal District Court had "ORDERED that, no

later than August 16, 2021, Webb SHALL file an Amended Complaint, which

outlines in simple and straightforward terms *why he thinks that he is entitled* to

relief and why the Court has jurisdiction over his case." *Webb v. Fauci*, Civ. Act. No. 3:2021-cv-00432 (E.D.Va. July 13, 2021).

136. In ministerial obligation, a "court shall expedite the consideration of. . . any action for temporary or preliminary injunctive relief, or any other action if good cause therefor is shown", and "[f]or purposes of this subsection, 'good cause' is shown if a right under the *Constitution of the United States* or a Federal Statute (including rights under section 552 of title 5) would be maintained in a factual context that indicates that a request for expedited consideration has merit." 28 U.S.C. § 1657(a).

137. Webb, at the time, had had, "because of his online presence and apparent savvy in social media", "the fastest growing Facebook page of any Republican running in 2016", republicinsanity, "Mike Webb," *Tumblr*, January 16, 2017, and "Facebook is the largest social media platform online, both the time on the platform and its daily active user base have grown year-over-year since its humble beginnings in a Harvard dorm room." Editors, "Facebook User & Growth Statistics," *Backlinko*, January 30, 2025.

138. Webb is the sole administrator for the for "Major Mike Webb for Governor of Virginia", https://www.facebook.com/MajorMikeWebbNow, a designated "Politician" page, with "1.5K followers", and he had had his account permanently disabled, in a "final decision", receiving the notification that they had "determined that you are no longer eligible to use Facebook", and had communicated to him, "Your account was disabled on July 19, 2021", as in

evidence at Exhibit **B**.

139.   Meta has never denied that they had, in fact, been informed that "for [specious and vague] safety and security reasons, we can't give you any additional information as to why your account was disabled", as in evidence at Exhibit **C**.

### *Retaliation Inference*

140.   "Right now, 2.11 billion daily users access Facebook's platform, a 5.5% increase year-over-year", and "3.065 billion monthly users access Facebook's platform, a 3.44% increase year-over-year", while "Facebook reported that it removed 691 million fake accounts in Q4 2023 alone". Editors, "Facebook User & Growth Statistics," *supra*[6].

141.   On July 19, 2021, by Bezos and Meta, just four days after "White House press secretary Jen Psaki [had] admitted her colleagues were 'flagging problematic posts for Facebook that spread disinformation'", Shannon Thaler, "Facebook removed COVID-19 posts, bowing to White House pressure: report," *New York Post*, July 28, 2023, and, within a reasonable time, just four days, Webb's Facebook account was disabled permanently, expressly for "security reasons", the topic of a court-acknowledge "protracted history". *Webb v. Executive Office of the President*, Civil Action No. 1:23-cv-00816 (D.C. May 14, 2024).

142.   The *First Amendment*, applicable to the States through the *Fourteenth*

---

[6] Facebook is the largest social media platform globally at 3.065 billion monthly active users worldwide, followed by YouTube (2.5 billion), and WhatsApp, Instagram, WeChat, TikTok, and Facebook Messenger all bringing in over a billion users." *Id.*

*Amendment*, commands that Congress shall make no law abridging the freedom of speech or freedom of assembly", *Norfolk 2nd Amendment Preservation Coalition v. City of Norfolk*, 106 Va. Cir. 215 (October 30, 2020) (citation omitted), and "[t]o establish a *First Amendment* freedom of speech or freedom of assembly violation against the government, the plaintiff must prove that government action prohibited the plaintiff from speaking or assembling." *Id.* (citing *Ibid.*).

143.    However, "when the Government has intentionally designated a place or means of communication as a public forum speakers cannot be excluded without a compelling governmental interest", *Cornelius v. NAACP Leg. Def. and Educ. Fund*, 473 U.S. 788 (1985); "[a]ccess to a nonpublic forum, however, can be restricted as long as the restrictions are 'reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.* (quoting *Perry Educ. Ass'n v. Perry Educators' Ass'n*, 460 U.S. 37 (1983)).

144.    Under the rule stated in *Thompson v. Bacon*, 245 Va. 107,425 S.E.2d 512 (1993), "[a] party alleging fraud must prove by clear and convincing evidence (1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to him." *Id.* (citing *Winn v. Aleda Constr. Co.*, 227 Va. 304 (1984)).

145.    In the present matter, "the averred fact of knowledge of the peril stated was absolutely essential", all heard, or should have "heard three or four short, shrill

- 43 -

whistles, one right after the other", just as all knew or should have known that "the blasts" are not made without reason. *St. Louis & S. F. R. Co. v. Model Laundry*, 42 Okla. 501 (June 20, 1918).

146.    "In this case, the defendants were, at least, on constructive notice regarding the condition. . . , as an owner/occupier is generally on constructive notice of what a reasonable inspection would reveal." *Hagadorn v. Prudential Ins. Co.*, 267 Ga. App. 143 (Ga. Ct. App. 2004).

147.    "Our whole constitutional heritage rebels at the thought of giving government the power to control men's minds", *Stanley v. Georgia*, 394 U.S. 557 (1969), and "[a] *prima facie* civil case — that is, the cluster of factual and legal assertions, which, if true, would authorize a judicial remedy — *remains the same from the beginning of a judicial proceeding to its end.*" *Parker v. Carilion Clinic*, 296 Va. 319 (Va. November 1, 2019).

148.    "Whether a fact is material depends on the relevant substantive law", *Davis v. Bryson*, Civil Action No.: 5:17-cv-00060 (W.D. Va. Apr. 25, 2018) (citing *Liberty Lobby, Inc.*, 477 U.S. at 242), and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment", while "[f]actual disputes that are irrelevant or unnecessary will not be counted"; *Ibid.* (citation omitted); "[t]he moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

149.    "The most stringent protection of free speech would not protect a man in

falsely shouting fire in a theatre and causing a panic", and "[i]t does not even protect a man from an injunction against uttering words that may have all the effect of force". *Schenck v. U.S.*, 249 U.S. 47 (1919) (citing *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418 (1911).

150.    "The doctrine of fraudulent concealment does not come into play, whatever the lengths to which a defendant has gone to conceal the wrongs, if a plaintiff is on notice of a potential claim", and "[a] key aspect of a plaintiff's case alleging fraudulent concealment is therefore proof that the plaintiff was not previously on notice of the claim he now brings." *Hobson*, 737 F.2d at 1.

151.    And "[n]otice, to comply with due process requirements, . . . must set forth the alleged misconduct with particularity", *In re Gault*, 387 U.S. 1 (1967) (internal quotation marks omitted), while "[t]he particularity with which alleged misconduct must be described varies with the facts and circumstances of the individual case; however, due process notice contemplates specifications of acts or patterns of conduct, not general, conclusory charges unsupported by specific factual allegations". *Spinelli v. City of New York*, 579 F.3d 160 (2d Cir. 2009).

152.    "By 'notice,' we refer to an awareness of sufficient facts to identify a particular cause of action, be it a tort, a constitutional violation or a claim of fraud." *Hobson*, 737 F.2d at 1.

153.    "We do not mean the kind of notice-based on hints, suspicions, hunches or rumors-that requires a plaintiff to make inquiries in the exercise of due diligence, but not to file suit." *Id.*

154. "When a plaintiff receives information sufficient to put him on inquiry notice, the statute of limitations will begin to run if the plaintiff does not reasonably exercise due diligence in conducting the inquiry"; "[i]n other words, he is held tort, a constitutional violation or a claim of fraud." *Id.*

155. Moreover, *Reid v. MSPB*, 508 F.3d 674 (Fed. Cir. 2007) articulates a timing/knowledge test to determine whether conduct is retaliatory, and, under this rule, the complainant need only demonstrate that "the deciding official knew of the [protected activity]. . . and that the adverse action was initiated within a reasonable time of [the same]".

156. Under the timing/knowledge test, a complainant "need not demonstrate the existence of a retaliatory motive. . . to establish that [the protected activity]. . . was a contributing factor". *Kewley v. HHS*, 153 F.3d 1357 (Fed. Cir. 1998) (quoting *Marano v. DoJ*, 2 F.3d 1137(Fed. Cir. 1993)).

157. Hence, "[o]nce the knowledge/timing test has been met, an administrative judge must find that the appellant has shown that. . . [the protected activity] was a contributing factor. . . , even if, after a complete analysis of all of the evidence, a reasonable factfinder could not conclude that the appellant's [protected activity]. . . was a contributing factor". *Schnell v. Department of the Army*, 114 M.S.P.R. 83 (2010).

158. "[W]hat is at stake here is loss of an opportunity to express . . . one's dissatisfaction with the laws and policies." *Dellums v. Powell*, 566 F.2d 167 (D.C. Cir. 1977).

## *Count Six: Unjust Enrichment*

**159.** Prudentially, in accordance with these tenets, Article III Courts had

previously adopted the rule that "[s]peculative fear of future harm does not

constitute an injury in fact sufficient to confer standing", *Sancho v. Dep't of

Energy*, No. 08-17389, D.C. No. 1:08-cv-00136-HG-KS, (9th Cir. 2010) (citing

*Mayfield v. U.S.*, 599 F.3d 964 (9th Cir. 2010)); *see also Muthry v. Missouri*, 144

S.Ct. 1972 (June 26, 2024)[7].

**160.** Claims of conversion, in unjust enrichment, amount to far more than merely

a "wrongful assumption or exercise of the right of ownership over goods or

chattels belonging to another in denial of or inconsistent with the owner's

rights." *Economopoulos v. Kolaitis*, 259 Va. 806 (Va. 2000) (citing *Credit Corp. v.

Kaplan*, 198 Va. 67 (1956)[8].

**161.** In *Perk v. Vector Resources Group, Ltd.*, 253 Va. 310 (Va. 1997), the plaintiff,

a creator of software, and other intellectual property items, had claimed that he

had suffered the "lost the value of his efforts in creating the converted items, the

fair market value of the items, and future profits", and that Reviewing Court

rebutted the claim that he had failed, therefor, to state a cause of action, noting

---

[7] "In these circumstances, Hines cannot rely on 'the predictable effect of Government action on the decisions of third parties'; rather, she can only "speculat[e] about the decisions of third parties." *Department of Commerce*, 588 U. S., at 768. It is "no more than conjecture" to assume that Hines will be subject to White House-induced content moderation. *Los Angeles v. Lyons*, 461 U. S. 95, 108 (1983)." *Id.*

[8] "An action for conversion can be maintained only by the person having a property interest in and entitled to the immediate possession of the item alleged to have been wrongfully converted." *Id.* (citing *United Leasing Corp. v. Thrift Ins. Corp.*, 247 Va. 299 (1994)).

the error of the Trial Court.

162.    "Conversion includes any distinct act of dominion wrongfully exerted over property that is in denial of, or inconsistent with, the owner's rights." *Hartzell Fan, Inc. v. Waco, Inc.*, 256 Va. 294 (Va. 1998) (citing *Hairston Motor Co. v. Newsome*, 253 Va. 129 (1997); *Universal C.I.T. Credit Corp. v. Kaplan*, 198 Va. 67 (1956)).

163.    "Generally, the measure of damages for the conversion of commercial paper is *prima facie* the face value". *Id.* (citing Va. Code § 8.3A-420(b); *American Nat'l Bank of Portsmouth v. Ames*, 169 Va. 711 (1938)).

164.    "When a company's stock gets released to the public in an initial public offering (IPO), there's usually not much news coverage outside of the financial media outlets"; however, that was not the case in 2012 when Facebook (FB+0.03%) announced its go-public event", and "[i]t was hard to avoid the buzz leading up to the stock's release day, and many social networking fans who had never invested in stocks before were interested in getting in on the action." Brian Withers, "If You Invested $5,000 in Facebook's IPO, This Is How Much Money You'd Have Now," *The Motley Fool*, November 17, 2019.

165.    "When the IPO rolled around in May 2012, the platform had an amazing 526 million daily active users across the globe and had achieved a $4 billion annual revenue run rate." *Id.*

166.    And, since "the introduction the COVID-19 ha[d] a tremendous impact on the stock market", researchers, "[w]ith the heightened volatility in stock prices

during the Covid-19 pandemic," recognizing "the need for price forecasting ha[d] become more critical", had decided to "investigate[] the forecast performance of four models including Long-Short Term Memory, XGBoost, Autoregression, and Last Value on stock prices of Facebook, Amazon, Tesla, Google, and Apple in COVID-19 pandemic time to understand the accuracy and predictability of the models in this highly volatile time region." *Id.*

167.    In fact, "the COVID-19 had a noticeable impact on the market that the price of the market increased after each wave of this virus reached its highest number of cases which resulted in high volatility", and, as a result, "after October 24, 2020, the price of Tesla, Apple, and Google significantly increased." *Id.*

168.    Researchers reported that "the statistical analysis of the stock prices was split into two major times one before the spread of COVID-19 and the second one after the time to understand the effect of this virus", and, "[f]rom January 2020 to April 2021, after this virus started to spread, that the Mean and SD of price are substantially higher than before January 2020." *Id.*

169.    Around the same time, of the Zuckerberg acquisition, "Jeff Bezos had purchased The Post for $250 million in 2013, less than a year after Mr. Baron had taken over", and "Mr. Bezos, who arrived at media ownership after founding Amazon and remaking online shopping, wanted his top editor to transform the newspaper from a regional news organization into a truly global one." Benjamin Mullin & Katie Robinson, "A Decade Ago, Jeff Bezos Bought a Newspaper. Now He's Paying Attention to It Again," *The New York Times*, July 22, 2023.

170. Truly "nothing short of clairvoyance would have enabled [anyone]. . . to anticipate that", *Link v. Wabash R. Co.*, 370 U.S. 626 (1962), the fortuitous reports, during the COVID-19 pandemic, that "Amazon remain[ed] one of the few companies to benefit from the coronavirus pandemic, with surging online sales helping it to report record profits in July." Annie Palmer, "Tech: How Amazon managed the coronavirus crisis and came out stronger," *CNBC*, September 29, 2020.

171. Prior to the global public health crisis, when Americans were forced to stay at home, and engage in social distancing from others, "[t]he second-biggest source of revenue for the [cable news] industry" was derived "from the paying public, accounting for 24% of total known news-related revenue," to include "circulation revenue as well as license and retransmission fees, which also come out of consumers' pockets in the form of cable bills, along with individual giving, typically to noncommercial media outlets", Jesse Holcolm & Amy Mitchell, "Audience Revenue," *Pew Research Center*, March 24, 2016, but, during the public health crisis had found, for the first time in history, transfer fee revenue exceeding advertising revenue, as people tuned in to learn about the world outside, compensating losses in advertising revenue for the five major television news companies, who "together own or operate at least 600 individual stations", Michael Barthel, Katerina Eva Matsa & Kirsten Worden, "Coronavirus-Driven Downturn Hits Newspapers Hard as TV News Thrives," *Pew Research Center*, October 29, 2020, arguably an incentive for journalists to keep the longest

respiratory tract infection pandemic in history going for as long as possible, an illegitimate business interest of itself.

172. "'Follow the money' is perhaps the most-cited phrase from the Watergate affair, though the source called Deep Throat never actually said that to Washington Post reporter Bob Woodward"; "[i]nstead, it was a line written by screenwriter William Goldman for his Oscar-winning screenplay of 'All the President's Men' (1976), based on the book by Woodward and co-author Carl Bernstein." Glenn Kessler, " 'Follow the money,' say ads funded by big-money groups," *Washington Post*, September 4, 2014.

173. In traditional conceptions of criminal jurisprudence, presuming that an *actus reus* is established, the dispositive inquiry would turn to the *mens rea*, wherein some courts have considered for conviction thereupon a finding of sufficient motive, means and opportunity. *Bowen v. Maynard*, 799 F.2d 593 (10th Cir.1986)[9].

### *Count Seven: Hatch Amendment to FACE Act*

174. Article III Courts have concluded that, with respect to the *Hatch Amendment to the FACE Act*, 18 U.S.C. § 248(a)(2), "'a place of religious worship' is anywhere that religious adherents collectively recognize or religious leadership designates as a space primarily to gather for or hold religious worship activities." *Jingrong v. Chinese Anti-Cult World Alliance Inc.*, 16 F.4th 47 (2d Cir. 2021).

---

[9] "Additionally, there was no evidence that 'Slick,' unlike Crowe, had motive, opportunity, and ability to kill the bartender." *Id.*

175. Under the *Hatch Amendment*, without express exception, anyone, who "by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person lawfully exercising or seeking to exercise the *First Amendment* right of religious freedom at a place of religious worship. . . shall be subject to the penalties provided in subsection (b) and the civil remedies provided in subsection (c)". 18 U.S.C. § 248(b)(2).

176. Despite the former Virginia Governor even publicly conceding "that he could not legally limit in-person worship ceremonies, noting that the recent Supreme Court decision against the state of New York prevented him from doing that", Charlie Spiering, "Gov. Ralph Northam Tightens Coronavirus Restrictions: You Don't Have to Sit In Church for God to Hear Your Prayers," *Breitbart*, December 10, 2020[10], perhaps in wishful thinking,"[o]ne-quarter of U.S. adults overall (24%) say their faith has become stronger because of the coronavirus pandemic," and "[t]he majority say their faith hasn't changed much (47%)"; however, "among U.S. adults who say they typically attend religious services at least once or twice a month, just 3% sa[id] their congregation [wa]s still holding in-person services", and "[t]he vast majority (91%) sa[id] their congregation ha[d] closed its religious services to the public". Claire Gecewicz, "Few Americans say their house of worship is open, but a quarter say their faith has grown amid pandemic," *Pew*

---

[10] "I have heard reports. They don't use distancing inside the church. They are not wearing masks. Quite frankly we know that a lot of the spread is coming from this,' he said." *Id.*

*Research Center*, April 30, 2020.

177. As a recipient of a letter from the Congregation for the Causes of Saints at the Vatican, "regarding the grace that Almighty God has bestowed", Angel Amato, *Letter to Petitioner*, November 28, 2016. *But see* Major Mike Webb for VA, "Letters of the Law: Postage Due," *YouTube*, July 27, 2017, https://youtu.be/Ywp8bgBi8GM, and "[j]ust as the prophets of the eighth century B.C. left their villages and carried their 'thus saith the Lord' far beyond the boundaries of their home towns, and just as the Apostle Paul left his village of Tarsus and carried the gospel of Jesus Christ to the far corners of the Greco Roman world," so was Webb "compelled to carry the gospel of freedom", feeling he, "[l]ike Paul, . . . must constantly respond to the Macedonian call for aid", and that he could not "sit idly by in Atlanta and not be concerned about what happens in Birmingham." Martin Luther King, Jr., *Letter from a Birmingham Jail*, April 16, 1963.

178. Perhaps, in their religious faith beliefs, church leaders, ignorant of the law, had not been convinced that "the time" had "come when they will not endure sound doctrine; but after their own lusts shall they heap to themselves teachers, having itching ears", when "they shall turn away their ears from the truth, and shall be turned unto fables", *2 Timothy* 4:3 (KJV), nor recognize a call to "[p]reach the word", "instant in season, out of season", to "reprove, rebuke, exhort with all long suffering and doctrine", *2 Timothy* 4:2 (KJV), and "watch . . in all things, endure afflictions, do the work of an evangelist" and "make full

proof of thy ministry", *2 Timothy* 4:5 (KJV), and they believe "the Lord Jesus Christ. . . shall judge the quick and the dead at his appearing and his kingdom", *2 Timothy* 4:5 (KJV); however, Webb, a member of the First Baptist Church of Alexandria, a church formerly affiliated with the Southern Baptist Churches, the son and grandson of Baptist pastors, with two family churches on the National Historic Registry, did respond to that call, albeit alone, utilizing his political campaigns in exercise in free speech, as well as providing counsel and advice for religious ministries on his Politician page on Facebook, prior to the permanent disabling of his access, for example, a specific instructional video to churches when they were being ordered to cancel in-person worship. *See* Major Mike Webb for VA, "Cock Suckas: But Wait 'Til You See My Peter," *YouTube*, April 11, 2010, https://youtu.be/HTdMSeaIXWs (accessed May 1, 2020).

### *Count Eight: Conspiracy to Violate Civil Rights*
### *42 U.S.C. § 1986*

179. Even world public health authorities had strongly encouraged world leaders expecting "imported cases"[11] to "[f]ully educate the general public", *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, February

---

[11] The verb form for the word, "import" means "to bring from a foreign or external source: such as. . . to bring (something, such as merchandise) into a place or country from another country", importing the implicit condition of a grant of permission. Editors, "Import," *Merriam-Webster Dictionary Online*, https://www.merriam-webster.com/dictionary/import (accessed November 26, 2023). Conversely, the verb form for the word "export" means, *inter alia*, "to carry or send (something, such as a commodity) to some other place (such as another country)", implying no permission from the country from which the item, commodity or merchandise had been exported for import. Editors, "Import," *Merriam-Webster Dictionary Online*, https://www.merriam-webster.com/dictionary/export (accessed November 26, 2023).

16-24, 2020, while the lead epidemiologist on their team dispatched to China at the beginning of the outbreak had diplomatically lamented, I think people aren't paying close enough attention." Julia Belluz, "China's cases of Covid-19 are finally declining: A WHO expert explains why," *Vox Media*, March 2, 2020, *updated* March 3, 2020.

180.  "It is not 'subject to reasonable dispute', Fed.R.Evid. 201(b), that, in 'the first pandemic in history that could be controlled", that world public health authorities had clearly stated that: "We cannot say this loudly enough, or clearly enough, or often enough: all countries can still change the course of this pandemic." Tedros Adhanom Ghebreyesus, "WHO Director-General's opening remarks at the media briefing on COVID-19," *supra*.

181.

182.  "Every person who, *having knowledge that any of the wrongs conspired to be done*," as here, "and mentioned in section 1985 of this title, are about to be committed, *and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do*, if such wrongful act be committed, shall be *liable to the party injured. . .* for all damages caused by such wrongful act", 42 U.S.C. § 1986, and, at a time when the local press had predicted it would "be more a coronation than an election on Nov. 2, but Democratic Arlington School Board endorsee Mary Kadera will still have a race to run", after Webb had "qualified for the School Board ballot" as "the lone opposition to Kadera, who. . . [had] won the Democratic endorsement over Miranda Turner." "Scott McCaffery,

"Two candidates end up on Arlington School Board ballot," *Inside NOVA/Arlington Sun Gazette*, June 9, 2021, Meta and Meta had permanently disabled Webb's access to his Politician page on Facebook.

183. "If the management knows that certain facts will necessarily prevent the regulatory approval ... and conceals these facts from the investing public, then there is scienter", *In re Chembio Diagnostics, Inc. Securities Litigation*, 586 F.Supp.3d at 199 (citations omitted), and it was not until late May 2021, "after the Wall Street Journal reported that three scientists at the Wuhan Institute of Virology were hospitalized in late 2019 with symptoms consistent with the virus", and after the former President had "ordered the intelligence community to 'redouble' its efforts to find out the virus' origin and report back in 90 days", that Meta had announced that "Facebook will no longer take down posts claiming that Covid-19 was man-made or manufactured, a company spokesperson told POLITICO. . . , a move that acknowledges the renewed debate about the virus' origins." Cristiano Lima, "Facebook no longer treating 'man-made' Covid as a crackpot idea," *Politico*, May 26, 2021.

184. Clearly, "the situation had changed", *People v. Pruitt*, 278 Ill. App. 3d 194 (Ill. App. Ct. 1996), and, at least according to news sources, "[t]he findings ha[d] reinvigorated the debate about the so-called Wuhan lab-leak theory, once dismissed as a fringe conspiracy theory", Cristiano Lima, "Facebook no longer treating 'man-made' Covid as a crackpot idea," *supra*; however, even by that time, two bookend, trace contact studies on the first variant, *see Report of the*

- 56 -

*WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, *supra*;
Ramanan Laxminaraya, *Epidemiology and transmission dynamics of COVID-19
in two Indian states*, *supra*, had established that, with a current acceptance rate
of just 4%, Editors, "Harvard University: #3 in National Universities," *U.S. News
& World Report*, https://www.usnews.com/best-colleges/harvard-university-
2155?edu-2294-control=true (accessed February 23, 2023), you had about as
much a chance of catching "'this dreaded virus'". Michelle Boorstein, "Prominent
Virginia pastor who said 'God is larger than this dreaded virus' dies of covid-19
the virus," *Washington Post*, April 13, 2020.

185.    According to the Federal District Court in Washington, "on March 23, 2021, .
. a *FOIA* request . . . regarding a request seeking to determine whether the
standard metrics of secondary attack rate and/or infectious dose were classified
information, and the White House did and continues to refuse to reply in any
manner to the request, *asserting a presumptive claim of executive privilege*'".
*Webb v. Executive Office of the President (EOP)*, pp. 2-3, July 28, 2023 (quoting
Compl. ¶ 70) (emphasis added).

186.    However, while "the judiciary, not the President, . . . [i]s the final arbiter of a
claim of executive privilege", an assertion of "presumptive privilege" will be
"overcome by. . . *prima facie* 'demonstration of need sufficiently compelling to
warrant judicial examination in chambers." *U.S. v. Nixon*, 418 U.S. 683 (1974)
(quoting *U.S. v. Mitchell*, 377 F. Supp. 1326 (D.D.C. 1974)).

187.    "By email of March 23, 2021, OMB [had] acknowledged receipt of. . . [a]

- 57 -

request and assigned it tracking number 21-220". Walsh Decl., p. 2, ¶ 3, *Webb v. EOP*, Civil Action No. 1:23-cv-00816 (D.D.C. August 29, 2024)

188.   "OMB[, independently, had] interpreted plaintiff's request as seeking all OMB records pertaining to any determination that either the infectious dose or secondary attack rate of COVID-19 (or its corresponding virus, SARS-CoV-2) [had] warranted classification at the Confidential", Walsh Decl., p. 3, ¶ 7, *supra*, a designation that "shall be applied to information, the unauthorized disclosure of which reasonably could be expected to cause damage to the national security that the original classification authority is *able to identify or describe*", E.O. 12,958, *Classified National Security Information*, Sect. 1.3(a)(3), April 17, 1995 (emphasis added), potentially "an unprecedented scandal at the highest levels of government, for most of the defendants had held major positions in the. . . administration", *U.S. v. Haldeman*, 559 F.2d 31 (D.C. Cir. 1976).

189.   "Absent a claim of need to protect military, diplomatic, or sensitive national security secrets, we find it difficult to accept the argument that even the very important interest in confidentiality of Presidential communications is significantly diminished by production of such material for *in camera* inspection with all the protection that a district court will be obliged to provide." *U.S. v. Nixon*, 418 U.S. 683 (1974), and, "[i]n no case shall information be classified in order to: (1) conceal violations of law, inefficiency, or administrative error; (2) prevent embarrassment to a person, organization, or agency; (3) restrain competition; or (4) prevent or delay the release of information that does not

require protection in the interest of national security." E.O. 12,958, *Classified National Security Information*, Sect. 1.8, *supra*,

190.  "Information may not be considered for classification unless it concerns: (a) military plans, weapons systems, or operations; (b) foreign government information; (c) intelligence activities (including special activities), intelligence sources or methods, or cryptology; (d) foreign relations or foreign activities of the United States, including confidential sources; (e) scientific, technological, or economic matters relating to the national security; (f) United States Government programs for safeguarding nuclear materials or facilities; or (g) vulnerabilities or capabilities of systems, installations, projects or plans relating to the national security". *Id.*, Sect. 1.5, *supra*

191.  Moreover, "'[i]nformation' means any knowledge that can be communicated or documentary material, regardless of its physical form or characteristics, that is owned by, produced by or for, or is under the control of the United States Government". *Id.* Sect. 1.1(b), *supra.*

192.  In a matter considering patent protection for a type of bacteria, the Supreme Court had established the rule that "'the patent laws . . . at the present time are understood to cover only inventions or discoveries in the field of inanimate nature'," *Diamond v. Chakrabarty*, 447 U.S. 303 (1980) (quoting S.Rep. No. 315, 71st Cong., 2d Sess., 8 (1930); H.R.Rep. No. 1129, 71st Cong., 2d Sess., 7-9 (1930), at Appendix A), and had held that the plaintiff's "claim is not to a hitherto unknown natural phenomenon, but to a nonnaturally occurring

manufacture or composition of matter -- a product of human ingenuity 'having a distinctive name, character [and] use'" *Id.* (citing *Hartranft v. Wiegmann*, 121 U.S. 609 (1887); hence, eligible for patent protection.

193.    Similarly, in *Assoc. for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576 (2013), the Supreme Court had held "that a naturally occurring DNA segment is a product of nature and not patent eligible merely because it has been isolated, but that cDNA is patent eligible because it is not naturally occurring".

194.    Accordingly, by operation of law, if a standard metric for assessment of risk was deemed to be classified information, as defined under Executive Order 12,958, *Classified National Security Information*, *supra*, it would have to have found its proximal origin in a laboratory.

195.    In a controversy arising from a matter in which the U.S. Solicitor General had asserted that "[t]he Government waives its right to file a response in this case, unless requested by the Court", that Article III Trial Court, a "court of record", Fed. R. Civ. P. 44(a)(1)(B)(1),  had also confirmed that a recent "particular action stems from a March 23, 2021 *FOIA* request that the plaintiff [had] submitted to OMB." *Webb v. EOP*, Civil Action No. 1:23-cv-00816, p. 3 (D.D.C. March 31, 2025).

196.    "OMB [had] additionally transmitted an order to search classified emails to the National Security Council (NSC)", on rationale that "NSC provides enterprise hosting of classified emails (Confidential, Secret, and Top Secret) for

all EOP components, including OMB", and because "NSC archives and captures classified email through the journaling process", and "Records Access and Information Security Management (RAIS) has 'back-end' access and conducts all classified email searches for EOP components, including OMB for the purposes of responding to *FOIA* and Litigation cases", after nine months of apparent planning for a two year search, Walsh Decl., p. 6, *supra*.

197.   Indeed, "the vast majority of *FOIA* cases can be resolved on summary judgment". *Brayton v. Off. Of U.S. Trade Rep.*, 641 F.3d 521 (D.C. 2011).

198.   On summary judgment, "the government's burden is a light one", *ACLU v. U.S. Dep't of Def.*, 628 F.3d 612 (D.C. Cir. 2011), because "'[u]ltimately, an agency's justification for invoking a *FOIA* exemption is sufficient *if it appears logical or plausible.*'" *Wilner v. NSA*, 592 F.3d 60 (2d Cir. 2009) (quoting *Larson v. Dep't of State*, 565 F.3d 857 (D.C. Cir. 2009)).

199.   Still, "'[t]he agency has the initial burden to demonstrate the adequacy of its search, which it may meet by providing declarations or affidavits that are relatively detailed[,] . . . nonconclusory and submitted in good faith.'" *Landmark Legal Found. V. EPA*, F. Supp. 2d 175 (D.C.C. 2013) (cleaned up)).

200.   For purposes of national security, *i.e.*, "the national defense or foreign relations of the United States", E.O. 12,958, *Classified National Security Information*, Sect. 1.1(a), *supra*, "'[i]nformation' means any knowledge that can be communicated or documentary material, regardless of its physical form or characteristics, that is owned by, produced by or for, or is under the control of

the United States Government", and "'[c]ontrol' means the authority of the

agency that originates information, or its successor in function, to regulate

access to the information." *Id.* Sect. 1.1(b), *supra.*

201.    "'Secret' or 'Confidential' original classification authority may be delegated

only by the President; an agency head or official designated pursuant to

paragraph (a)(2), above; or the senior agency official, provided that official has

been delegated 'Top Secret' original classification authority by the agency head."

E.O. 12,958, *Classified National Security Information*, Sect. 1.4(c)(3), *supra. See

also* 75 Fed. Reg. 2, December 29, 2009.

202.    "Each delegation of original classification authority shall be in writing and

the authority shall not be redelegated except as provided in this order", and

"[e]ach delegation shall identify the official by name or position title." *Id.*, Sect.

1.4(c)(4), *supra.*

203.    "Exemption 1 is 'specifically designed to allow government agencies to

withhold information that might jeopardize our national security'", and

"Exemption 1 of *FOIA* prevents access to classified documents", in *Milner v.

Dep't of the Navy*, 562 U.S. 562 (2011) (citing 5 U.S.C. § 552(b)(1); *see also

Milner v. Dep't of the Navy*, 575 F.3d 959 (9 th Cir. August 5, 2009) (W. Fletcher,

J., dissenting).

204.    "Absent a claim of need to protect military, diplomatic, or sensitive national

security secrets, we find it difficult to accept the argument that even the very

important interest in confidentiality of Presidential communications is

significantly diminished by production of such material for *in camera* inspection with all the protection that a district court will be obliged to provide." *Nixon*, 418 U.S. at 683.

205.   Nor does the White House "even claim that. . . [they had] relied on *any* 'conclusion or statement of *law*,' let alone one 'issued by an official charged with interpretation, administration, and/or enforcement responsibilities in the relevant legal field.'" *North*, 910 F.2d at 843 (citing *Barker*, 546 F.2d at 940).

206.   To date, the Government has refused to respond to that request, and, as to a finding of probable cause, "'in justifying the particular intrusion[,] the police officer must be able to point to *specific and articulable facts* which . . . reasonably warrant that intrusion'", *South Dakota v. Opperman*, 428 U.S. 364 (1976) (quoting *Terry v. Ohio*, 392 U.S. 1 (1968)),  as reasonably appears to be the case at bar, and "[s]uch a requirement of 'specificity in the information upon which police action is predicated is the central teaching of this Court's *Fourth Amendment* jurisprudence'". *Id.* (quoting *Ibid.* n. 18)[12].

### *42 U.S.C. § 1985(2)*

207.   "[I]f two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce,

---

[12] "'Information' means may information or material, regardless of its physical form or characteristics, that is owned by, produced by or for, or is under the control of the United States Government." Section 6.1(b), Executive Order No. 12,356, *National Security Information*, April 2, 1982.

the right of any person, or class of persons, to the equal protection of the laws",
"whereby another is injured in his person or property, or deprived of having and
exercising any right or privilege of a citizen of the United States, the party so
injured or deprived may have an action for the recovery of damages occasioned
by such injury or deprivation, against any one or more of the conspirators." 42
U.S.C. § 1985(2).

208.   "Murder, other than aggravated murder, . . . and premeditated killing, . . is
murder of the first degree, punishable as a Class 2 felony." Va. Code § 18.2-32.

209.   "All murder other than aggravated murder and murder in the first degree is
murder of the second degree and is punishable by confinement in a state
correctional facility for not less than five nor more than forty years." *Id.*

210.   "[S]etting an early benchmark, . . . former Deputy CIA Director Michael J.
Morell had stated, conclusively, that, while COVID-19 would 'be with us for
some time — perhaps 18-24 months (which... [had been] the... opinion of many
medical experts), *barring a breakthrough with either a vaccine or an anti-viral.*"
Michael Morell, "Analysis: The national security implications of COVID-19,"
*CBS News*, May 8, 2020.

211.   "However, this worldwide emergency would not be terminated until May
2023," *Id.* (citing Editors, "WHO chief declares end to COVID-19 as a global
health emergency," *UN News*, May 5, 2023).

212.   While apparently relying upon dumb luck during a pandemic to reap
fortunes, "Mark Zuckerberg [had] founded Facebook at the age of 20, initially as

a small project in his Harvard dorm room", and, "[b]y 2023, Facebook had

become the world's largest social media platform with over 2.9 billion monthly

active users"; "[t]his achievement was not accidental but the result of a series of

strategic decisions and continuous trial and error by Zuckerberg and his team."

Editors, "How Zuckerberg Turned Facebook into a Global Giant from His Dorm

at 20: Unveiling the Misjudgments and Replicable Success Mechanisms,"

*Millionaire Match*, June 4, 2025.

213.    This genius would have others believe that he and his team were wholly

unaware that contrary to claims associated with a lifted from context quotation

from a Nobel Laureate, that "[t]he single biggest threat to man's continued

dominance on the planet is the virus'", and that "' we could do little better than

to sit back and wait for the avalanche'", Robin Marentz Henig, "Experts warned

of a pandemic decades ago. Why weren't we ready?" *National Geographic*, April

8, 2020, highly contagious diseases, in nature, are a rather rare occurrence. René

Gottschalk, *Management of highly contagious, life-threatening infectious diseases*

*in Germany*, 58 *Bundesgesundheitsblatt Gesundheitsforschung*

*Gesundheitsschutz* 7, pp. 657-61 (July 2015).

214.    Zuckerberg and his wonderful team would have others believe that they were

unaware that, before the COVID-19 pandemic, phenomenon that have recurred

every two decades, since the Spanish Flu Pandemic, without societal disruption,

Yen-Chin Liu, Rei-Lin Kuo & Shin-Ru Shih, *COVID-19: The first documented*

*coronavirus pandemic in history*, 43 Biomed., pp. e333, May 5, 2020, only a total

of "[s]even human coronaviruses (HCoVs) ha[d] been. . . identified, namely

HCoV-229E, HCoV-OC43, HCoV-NL63, HCoV-HKU I, severe acute respiratory

syndrome coronavirus (SARS-CoV), Middle East respiratory syndrome

coronavirus (MERS-CoV) and the novel coronavirus (2019-nCoV, a.k.a. SARS-

CoV-2)." Ding X. Liu, Jia Q. Liang, & To S. Fung, *Human Coronavirus-229E, -*

*OC43, -NL63, and HKU1 (Coronaviridae)*, Encycl. Virol., pp. 428-440 (January

2021)).

215.    Moreover, it is an empirical fact, with regard to the largest viruses in genome

mass, Patrick C.Y. Woo, *et al.*, *Coronavirus genomics and bioinformatics*

*analysis*, 2 Viruses 8, pp. 1804-1820, August 24, 2010; D.A. Brian & R.S. Baric,

*Coronavirus genome structure and replication*, 287 Curr. Top. Microbiol.

Immunol., pp. 1-30 (2005), and, "in order to maintain genetic stability, the large

genome size requires unusual enzymatic activities, such as an exoribonuclease

and an endoribonuclease activity", and "the synthesis of a nested set of sgRNAs

by discontinuous transcription demands a huge and complicated RTC", Ding X.

Liu, Jia Q. Liang, & To S. Fung, *Human Coronavirus-229E, -OC43, -NL63, and -*

*HKU1 (Coronaviridae), supra*, which, as a practical matter, actually serves to

restrict the range of possible mutations along the genome strand.

216.    Nonetheless, "'[u]nlike the highly pathogenic SARS-CoV, MERS-CoV, and

2019-nCoV, the four so-called common HCoVs generally cause [only] mild upper-

respiratory tract illness and contribute to 15%—30% of cases of common colds in

human adults, although severe and life threatening lower respiratory tract

infections can sometimes occur in infants, elderly people, or immunocompromised patients". *Id.*

217.   In fact, "[i]t ha[d] been realized quite recently that viral particles are by far the most abundant biological entities on our planet (Suttle 2007)", "ten times more abundant than bacterial cells in the upper ocean", Patrick Forterre, *Defining life: the virus viewpoint,* 40 Orig. Life Evol. Biosph. 2, pp. 151-160, March 3, 2010.

218.   Zuckerberg and his team had somehow failed to follow the science, to note how, commencing "with a thorough understanding of the aetiology of the target virus which appears in this case to be quite singular", Birger Sørensen, Andres Susrud & Angus George Dalgleish, *Biovacc-19: A Candidate Vaccine for Covid-19 (SARS-CoV-2) Developed from Analysis of its General Method of Action for Infectivity,* 1 QRB Disc., pp. e6 (1–11), May 29, 2020, almost a quarter century ago, Ralph Baric and Zhengli Shi, "the batwoman", "[had] concluded that *the SARS-like-CoV* carried by bats *is not contagious to humans*", Li Xu (Masters Thesis), "The Analysis of Six Patients With Severe Pneumonia Caused By Unknown Viruses", *Kun Ming Medical University* (May, 2013) (citing Wendong Li, *et al., Bats are natural reservoirs of SARS-like coronaviruses,* 28 Science 310, October 28, 2005).

219.   Specifically, by 2005, it was known that "SARS-CoV has a unique set of ORFs not shared by any of the other coronaviruses", Wendong Li, Zhengli Shi, *et al., Bats are natural reservoirs of SARS-like coronaviruses, supra* (citing M.C.

Lai & K.V. Holmes, Vol. 2, Chap. 35, D.M. Knipe, *et al. (eds.), Fields Virology*), Lippincott, Williams & Wilkins, Philadelphia (2001); D.A. Brian & R. Baric, 287 Curr. Top. Microbiol. Immunol., p. 1 (2005)), and "[m]ost of these ORFs were also present in SL-CoV," or SARS-like coronaviruses, "confirming the extremely close relationship between SARS-CoV" and the SARS-like viruses. *Id.*

220.  Yet, "SL-CoV is completely different from bat coronavirus", warranting the clarifying modification that "[h]ereafter, SARS-CoVs and SL-CoVs will be collectively called the SARS cluster of coronaviruses." *Id.*

221.  Zuckerberg and Meta would have others believe that they had no idea that "[s]ince the 2001 terrorist attacks, the United States government has allocated nearly $50 billion to address the threat of biological weapons." *Editors*, "S. 15 (108th): *Project BioShield Act of 2004*," *supra.*

222.  Yet, "a single Ford-class carrier costs approximately $12.998 billion (FY2018), not including the aircraft wing, the investment becomes even more staggering." Anthon Blackwood, "How Much Does an Aircraft Carrier Cost? A Comprehensive Breakdown," *supra.*

223.  Hence, Congress, rather than having spent billions of dollars to stockpile vaccines that were neither necessary nor proper, could have increased the number of these major commercial platforms to 15. Lolita C. Baldor, "A look at where the Navy's 11 aircraft carriers are now," *supra.*

224.  "Ignorance and mistake of the law can furnish no ground for relief in a court of equity, and least of all in a case in which the party had full opportunity in

- 68 -

another forum to protect himself against the consequences of such ignorance and mistake, by the exercise of the most ordinary prudence and the performance of a plain duty." *Meem v. Rucker*, 51 Va. 506 (Va. 1853).

225.    "Additional proof of authenticity as a condition precedent to admissibility is not required with respect to. . . [a]ny. . . document, or other matter declared by any law of the United States or of this Commonwealth, to be presumptively or *prima facie* genuine or authentic", Va. S. Ct. R. 2:902(3), and, the record reflects that "acting pursuant to his authority to issue a 'notice pursuant to section 564 of the *Federal Food, Drug, and Cosmetic (FD&C) Act*, Alex M. Azar II, acting as the Secretary", "[o]n February 4, 2020," had "determined pursuant to his authority under section 564 of the *FD& C Act* that there is a public health emergency that has a significant potential to affect *national security* or the health and security of United States *citizens living abroad* and that involves a novel (new) coronavirus (nCoV)[,] first detected in Wuhan City, Hubei Province, China in 2019 (2019-nCoV)." 85 Fed. Reg. 26, *supra* (emphasis added).

226.    "The very first of active duty, uniformed service member would not succumb to the novel coronavirus until April 13, 2020, Newsroom, "U.S. Navy ID's Arkansas sailor as first active-duty military member to die of coronavirus," *CBS News*, April 17, 2020, the first of only a total of 96, on active duty, in the reserve component and national guards, by the end of last year, Staff, "Coronavirus: DOD Response," *DoD*, December 8, 2022, https://www.defense.gov/Spotlights/Coronavirus-DoD-Response/ (accessed

- 69 -

August 4, 2023), arguably rendering any other use outside that scope an "unauthorized commitment" under the Federal Acquisition Regulations. FAR § 1.602-3. *See also Webb v. Bowser*, Civil Action No. 1:22-cv-02628 (UNA) (D.C. 2022).

227.   "The virus is now named SARS—CoV—2, which causes the illness COVID—19." 85 Fed. Reg. 63, April 1, 2020.

228.   Emphasizing a "warp speed" delivery, "the Trump administration had used the *Defense Production Act* 18 times to aid vaccine development", Sydney Lupkin, "*Defense Production Act* Speeds Up Vaccine Production," *NPR*, March 13, 2021, and, "[o]n March 27, the administration announced it would use the *Defense Production Act* in response to COVID-19 (coronavirus)";"[t]he President [had] directed the Department of Health and Human Services to work with General Motors to prioritize the production of ventilators that could be used to help a growing volume of patients experiencing respiratory issues", Editors, "What is the *Defense Production Act*, and how is it being used in response to COVID-19?" *GAO*, April 7, 2020.

229.   "[T]he Biden administration. . . [had been only] picking up where the previous administration left off", "for essential vaccine ingredients and manufacturing must-haves that get used up quickly, which aren't currently in shortage domestically but could be limiting factors in the future." Sydney Lupkin, "*Defense Production Act* Speeds Up Vaccine Production," *supra*.

230.   "All six COVID-19 vaccines that were developed as part of Operation Warp

Speed have benefited from the *Defense Production Act* in some way, according to a press release by Lisa Simunaci, a former spokesperson for the Office of the Secretary of Defense", and, [i]n the run-up to President Biden's promise on March 2 that there would be enough COVID-19 vaccines for every adult in the United States by the end of May, he talked up a Korean War era law called the *Defense Production Act*." *Id.*

231. "Historically, epidemics are a time of fear, confusion, and helplessness". Jeremy Howard, *et al.*, *An evidence review of face masks against COVID-19*, 118 PNAS 4, pp. e2014564118, December 5, 2020 (citing W. Van Damme, W. Van Lerberghe, *Editorial: Epidemics and fear*, 5 Trop. Med. Int. Health, pp. 511–514 (2000); M. A. Riva, M. Benedetti & G. Cesana, *Pandemic fear and literature: Observations from Jack London's The Scarlet Plague*, 20 Emerg. Infect. Dis., pp. 1753–1757 (2014)).

232. Perhaps having heard "immunity", deafened to the sound of "defense", most Americans are probably wholly unaware that, under the *Defense Production Act*, "authorities under this chapter should be used to reduce the vulnerability of the United States to terrorist attacks, and to minimize the damage and assist in the recovery from terrorist attacks that occur in the United States", 50 U.S.C. § 4502(b)(5), and, "in order to ensure productive capacity *in the event of an attack* on the United States, the United States Government should encourage the geographic dispersal of industrial facilities in the United States to discourage the concentration of such productive facilities within limited geographic areas

- 71 -

that are *vulnerable to attack by an enemy of the United States*", 50 U.S.C. §

4502(b)(6) (emphasis added), not a risk of contracting an infectious disease.

233.    For purposes of the *Defense Production Act (DPA)*, "[t]he term 'national

defense' means programs for military and energy production or construction,

military or critical infrastructure assistance to any foreign nation, homeland

security, stockpiling, space, and any directly related activity." 50 U.S.C §

4552(14).

234.    At least those engaged in intellectual property law and in pharmaceuticals is

aware of the procedure for an *Abbreviated New Drug Application (ANDA)*, 21

CFR§ 314.94, and "[t]he '*Drug Price Competition and Patent Term Restoration

Act of 1984*,' also known as the *Hatch-Waxman Amendments*, established

bioequivalence as the basis for approving generic copies of drug products", and

"[t]hese *Amendments* permit FDA to approve applications to market generic

versions of brand-name drugs without repeating costly and duplicative clinical

trials to establish safety and efficacy." Editors, "*Abbreviated New Drug

Application (ANDA)*," *FDA*, October 3, 2025.

235.    "Under the *Hatch-Waxman Amendments*, brand-name companies gained

patent term extension to account for the time the patented product is under

review by FDA and also gained certain periods of marketing exclusivity"; "[i]n

addition to the *ANDA* approval pathway, generic drug companies gained the

ability to challenge patents in court prior to marketing as well as 180-day

generic drug exclusivity." *Id.*

236. "Generic drug applications are termed 'abbreviated' because they are generally *not required to include preclinical (animal) and clinical (human) data to establish safety and effectiveness*"; "[i]nstead, generic applicants must scientifically demonstrate that their product performs in the same manner as the innovator drug." *Id.* (emphasis added).

237. "One way applicants demonstrate that a generic product performs in the same way as the innovator drug is to measure the time it takes the *generic drug to reach the bloodstream* in healthy volunteers", and "[t]his demonstration of 'bioequivalence' gives the rate of absorption, or bioavailability, of the generic drug, which can then be compared to that of the innovator drug." *Id.*

238. "To be approved by FDA, the generic version must [only] deliver the *same amount of active ingredients* into a patient's bloodstream in the *same amount of time* as the innovator drug." *Id.*

239. "Federal law generally prohibits anyone from introducing or delivering for introduction into interstate commerce any 'new drug' or 'biological product' unless and until FDA has approved the drug or product as safe and effective for its intended uses." Dawn Johnsen, Memorandum Opinion for the Deputy General Counsel to the President, "Whether Section 564 of the Food, Drug, and Cosmetic Act Prohibits Entities from Requiring the Use of a Vaccine Subject to an Emergency Use Authorization," July 6, 2021 (citing FDCA §§ 301(a), 505(a), 21 U.S.C. §§ 331(a), 355(a); 42 U.S.C § 262(a)).

240. Clearly, "[a] vaccine is both a drug and a biological product." *Id.* (citing *FDCA*

§ 201(g), 21 U.S.C § 321(g); 42 U.S.C. § 262(i)(1)).

241.    And, "[i]n 2003, Congress [had] addressed a problem raised *in emergency situations* where "the American people *may be placed at risk of exposure to biological, chemical, radiological, or nuclear agents,* and the diseases caused by such agents," but where, "[u]nfortunately, there may not be approved or available countermeasures to treat diseases or conditions caused by such agents,' even though 'a drug, biologic, or device is highly promising in treating [such] a disease or condition.'" *Id.* (quoting H.R. Rep. No. 108-147, pt. 1, at 2 (2003)).

242.    Effectively, the "COVID-19 vaccines" had been subjected, not to an effectiveness test, clinically distinct from an efficacy test, but rather only, before approval, a mere preprint of an efficacy test[13], in contravention, and in willful circumvention of required for a *New Drug Application (NDA)*, 21 CFR § 314.125, a patent defect *per se*, and "[j]udicial review of agency action. . . is limited to 'the grounds that the agency invoked when it took the action.'" *Department of Homeland Security v. Regents of University of California*, 591 U.S. 1 (2020) (quoting from 576 U.S. 743 (2015)).

243.    "If those grounds are inadequate, a court may remand for the agency to . . . offer 'a fuller explanation of the agency's reasoning at the time of the agency action'," *Id.* (quoting *Pension Benefit Guaranty Corporation v. LTV Corp.*, 496 U.S. 633 (1990)); "[i]n short, good faith would be presumed in the absence of a

---

13 Stephen J. Thomas, et al., Six[-]Month Safety and Efficacy of the BNT162b2 mRNA COVID-19 Vaccine, MedRxIV, July 28, 2021.

showing to the contrary in the manner permitted by our cases." *University of California Regents v. Bakke*, 438 U.S. 265 (1978) (citing *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252 (1977); *Washington v. Davis*, 426 U.S. 229 (1976); *Swain v. Alabama*, 380 U.S. 202 (1965)). *See also Grutter v. Bollinger*, 539 U.S. 306 (2003).

244.  "Bad faith is not just intentional conduct but intent to engage in conduct for an impermissible reason, willful noncompliance, or willful ignorance of the facts", *Brewer v. Lennox Hearth Prods., LLC*, 601 S.W.3d 704 (Tex. 2020); *see also Schultz v. Schultz*, No. 05-20-00819-CV, 2022 WL 336564 (Tex. App. — Dallas, February 4, 2022).

245.  "In short, good faith would be presumed in the absence of a showing to the contrary in the manner permitted by our cases." *Univ. of Calif. Regents v. Bakke*, 438 U.S. 265 (1978) (citing cases).

## *42 U.S.C. § 1985(3)*

246.  42 § 1985 "creates a cause of action for a person 'injured in his person or property" due to a proscribed conspiracy." *Thompson v. Trump*, 590 F. Supp. 3d 46 (D.D.C. February 18, 2022) (quoting 42 U.S.C. § 1985(3)). Moreover, "[t]he statute makes no distinction between physical and emotional injury, and in that sense it aligns with the common law tradition of permitting recovery for emotional distress for certain torts without a showing of physical injury." *Id.*

247.  "Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned [in section 1985 of this title], are about to be committed, and having power to prevent or aid in preventing the commission of the same,

neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented." *Id.* (quoting 42 U.S.C. § 1986). "The statutory provision is unique", as "[i]t requires persons with knowledge of a conspiracy proscribed in § 1985 and with the means to prevent the conspiracy to take affirmative actions to do so." *Id.* Hence, "[a] person who", as here, "refuses or neglects to exercise such power is liable for damages to those persons whose injuries could have been prevented." *Id.*

248. Neither Zuckerberg nor Meta can "dispute that COVID-19," often described as "a highly contagious and deadly virus, falls within this definition." Id. *Perez,* Crim. Act. No.: 5:20-CR-283-DAE-1, 2021 WL 4621695, *supra.*

249. "Where presumptive reasonableness is challenged by probative evidence of unreasonableness, the challenge must be met by some evidence of reasonableness." *In re July 31, 2013 Decision of Bd. of Zoning Appeals of Fairfax Cty.*, 88 Va. Cir. 235 (2014).

250. "If evidence of reasonableness is sufficient to make the question fairly debatable, the ordinance 'must be sustained.'" *Id.* "If not, the evidence of unreasonableness defeats the presumption of reasonableness and the ordinance cannot be sustained." *Id.*

251. Moreover, "for evidence to be of probative force it must serve to prove the asserted proposition and it must be more than a mere surmise or suspicion".

*Marriage of York, Matter of*, 613 S.W.2d at 764 (citing *Joske*, 91 Tex. at 574).

252.   In other words, "[t]he conspirators 'must share the general conspiratorial objective, but they need not know all the details of the plan . . . or possess the same motives." *Hobson*, 737 F.2d at 1.

253.   "Thus, to 'demonstrate the existence of a conspiratorial agreement, it simply must be shown that there was", as here, "'a single plan, the essential nature and general scope of which [were] known to each person who is to be held responsible for its consequences.'" *Id.* (quoting *Hampton*, 600 F.2d at 600 (quoting *Hoffman-LaRoche, Inc.,* 447 F.2d at 872).

254.   "To make the conspiracy actionable, there must also be an overt act", as here, "in furtherance of the object of the conspiracy that injures plaintiff in his person or property or, in a section 1985(3) action, which deprives him of having or exercising any right or privilege of a citizen of the United States." *Id.*

### *Count Nine: Racketeering and Tortious Interference*

255.   "[I]n cases where the acts of the defendant or the enterprise were inherently unlawful, such as murder. . . , the courts generally have concluded that the requisite threat of continuity was adequately established by the nature of the activity, even though the period spanned by the racketeering acts was short", *Eisert v. Town of Hempstead*, 918 F. Supp. 601 (E.D.N.Y. 1996).

256.   "Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control", *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) (quoting 18 U.S.C. § 2339B(h)),

and "a terrorist is 'any one who attempts to further his views by a system of coercive intimidation.'" *U.S. v. Christianson*, 586 F.3d 532 (7th Cir. 2009) (quoting XVII *Oxford English Dictionary* 821 (2d ed. 1989); *Webster's Third New International Dictionary* 2361 (1981)).

257.    Where "the object crimes alleged. . . were part of a broader conspiracy 'intended to promote' enumerated crimes of terrorism", it has been held that "[t]he terrorism enhancement applies no matter which object crimes were assumed in the guilty verdict, so there is no need to determine beyond a reasonable doubt that. . .[a defendant or defendants] conspired to commit any one of the named object crimes in particular." *U.S. v. Graham*, 275 F.3d 490 (6th Cir. 2001).

258.    Furthermore, "[i]f the act is among the litany of crimes listed in § 2332b(g)(5)(B), which include a bevy of the most harmful and odious acts in the criminal code, including everything from murder and torture to the destruction of government property, and it was 'calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct,' then it is a federal crime of terrorism", *Christianson*, 586 F.3d at 532 (quoting 18 § 2332b(g)(5)(B)), "[a]nd for all intents and purposes at sentencing, that person is a terrorist." *Id.*

259.    While using biological agents as a weapon of terror is a separate felony under 18 U.S.C. § 175, as would describe a biological agent cultivated in a laboratory, which the causative biological agent for COVID-19 appears to be, transnational

terror, under 18 U.S.C. § 2332b, is not only a felony, punishable by death or life imprisonment, but is also a predicate offense under the federal racketeering statute, under 18 U.S.C. § 1961(1)(G).

260.    However, under 18 U.S.C. § 2332b(b)(1)(C), for jurisdictional purposes, "the victim, or intended victim, is the United States Government, *a member of the uniformed services*, or any official, officer, employee, or agent of the legislative, executive, or judicial branches, or of any department or agency, of the United States" (emphasis added).

261.    And, as of December 2022, when the Department of Defense discontinued reporting data, to date, a total of 96 uniformed service members had been fatalities to COVID-19, Staff, "Spotlight: Coronavirus: DoD Response," *DoD*, December 8, 2022, the first of whom was identified as "Aviation Ordnanceman Chief Petty Officer Charles Robert Thacker Jr., 41, of Fort Smith, Arkansas," a "crew member of the aircraft carrier *USS Theodore Roosevelt*", at the U.S. Naval Hospital in Guam of COVID-19, just "11 days after his captain was fired for pressing the Navy for greater action to safeguard his crew from the virus." Newsroom, "U.S. Navy ID's Arkansas sailor as first active-duty military member to die of coronavirus," *CBS News*, April 17, 2020.

262.    "It shall be unlawful for any person through a pattern of racketeering activity. . . , directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce", 18 U.S.C. § 1962(b).

263. "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity". 18 U.S.C. § 1962(c).

264. Moreover, "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d).

265. "Any person injured in his business or property", as here, "by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962." 18 U.S.C. § 1964(c).

266. "[R]acketeering activity' means (A) any act or threat involving murder," 18 U.S.C. § 1961(1), and a "'pattern of racketeering activity' requires", as here, "at least two acts of racketeering activity". 18 U.S.C. § 1961(5).

267. An "'enterprise' includes", as here, "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity". 18 U.S.C. § 1961(4).

268. "[O]nce the conspiracy has been established, the government need show only 'slight evidence' that a particular person was a member of the conspiracy." *U.S.*

*v. Elliott*, 571 F.2d 880 (5th Cir. 1978) (quoting *U.S. v. Morado*, 454 F.2d 167 (5th Cir. 1972)).

269.  To establish a *prima facie* case of conspiracy, a complainant must "prove. . .that an agreement existed between the ... men by some concerted action", *Fortune*, 12 Va. App. at 643 (quoting *Reed v. Commonwealth*, 213 Va. 593 (1973)), and "[b]ecause most conspiracies are 'clandestine in nature,' 2 Wayne R. LaFave, *Substantive Criminal Law* § 12.2(a), at 266 (2d ed. 2003), by 'the very nature of the offense, it often may be established only by indirect and circumstantial evidence". *Roy v. Commonwealth*, No. 1403-15-2, 2017 WL 894622 (Va. Ct. App. Mar. 7, 2017) (quoting *Wright v. Commonwealth*, 224 Va. 502 (1982)).

270.  "[W]hen 'it has been shown that the defendants 'by their acts pursued the same object, one performing one part and the others performing another part ..., the [fact finder] will be justified in concluding that they were engaged in a conspiracy ....'" *James v. Commonwealth*, 53 Va. App. 671 (2009) (quoting *Charity v. Commonwealth*, 49 Va. App. 581 (2007)).

271.  "Without more, mere 'proof of overt acts in themselves is not sufficient, for it must be established that the conspiracy or agreement which is charged to have existed ... had been formed before and was existing at the time of the commission of [any] overt act or acts.'" *Poole v. Commonwealth*, 7 Va. App. 510 (1988) (quoting *Harms v. U.S.*, 272 F.2d 478 (4th Cir. 1959)).

272.  Clearly, "evidence of . . . flight. . . [is] admissible even if offered solely to

prove his consciousness of guilt as to that predicate act", *U.S. v. Pungitore*, 910 F.2d 1084 (3d Cir. 1990); *see also* Sherry Gaba, "Understanding Fight, Flight, Freeze and the Fawn Response," *Psychology Today*, August 22, 2020[14].

273.    Further, a complainant "may prove the defendant's knowing participation in a conspiracy through circumstantial evidence, including: (1) the defendant's association with conspirators in furtherance of the conspiracy; (2) his or her presence at 'critical stages of the conspiracy that cannot be explained by happenstance'; (3) his or her 'possession of items that are of essential significance to the conspiracy'; and (4) acts that show a consciousness of guilt, including false exculpatory statements", *U.S. v. Climico*, No. S2 11 CR. 974-08 CM, 2014 WL 4230320 (S.D.N.Y. Aug. 7, 2014) (quoting *U.S. v. Anderson*, 747 F.3d 51 (2d Cir.2014).

274.    "[M]ere acquiescence or silence or failure of an officer to perform a duty does not make one a participant in a conspiracy *unless he acts or fails to act with knowledge of the purpose of the conspiracy 'and with the view of protecting and aiding it*," *Luteran v. U.S.*, 93 F.2d 395 (8th Cir. 1937) (quoting *Burkhardt v. U.S.*, 13 F.2d 841 (6th Cir. 1926). (emphasis added).

275.    Moreover, "a defendant is presumed to continue his involvement in a conspiracy unless he makes a substantial affirmative showing of 'withdrawal,

---

[14] Medical science has determined that "[t]he most well-known responses to trauma are the fight, flight, or freeze responses", and science has evolved to recognize "a fourth possible response, the so-called fawn response." Id. Moreover, "[f]light includes running or fleeing the situation, fight is to become aggressive, and freeze is to literally become incapable of moving or making a choice." *Id.*

abandonment, or defeat of the conspiratorial purpose,'" *U.S. v. Heard*, 709 F.3d

413 (5th Cir. 2013)(quoting U.S. *v. Mann,* 161 F.3d 840 (5th Cir.1998) (quoting

*United States v. Puig–Infante,* 19 F.3d 929 (5th Cir.1994)), while "[m]ere

cessation of activity in furtherance of the conspiracy is not sufficient to show

withdrawal." *Id. (citing  U.S. v. Torres*, 114 F.3d 520 (5th Cir.1997) (citing *U.S.

v. Phillips*, 664 F.2d 971 (5th Cir. Unit B 1981)).

276.    ""A plaintiff must make specific factual allegations of combination,

agreement, or understanding among all or between any of the defendants to plot,

plan, or conspire to carry out the alleged chain of events."" *Dennison v.

Pennsylvania Dept. of Corrections*, 268 F. Supp. 2d 387 (E.D.Pa. June 9, 2003)

(quoting *Marchese v. Umstead*, 110 F. Supp. 2d 361 (E.D.Pa.2000) (quoting

*Panayotides v. Rabenold*, 35 F. Supp. 2d 411 (E.D.Pa. 1999)).

277.    Under the controlling law, a conspiracy may be established where there is

credible, convincing evidence that "'[t]he alleged conspiracy could not have been

carried out by [only] one person", *Prichard v. U.S.*, 181 F.2d 326 (6th Cir.), *aff'd

sub nom. Prichard v. United State of Am.,* 339 U.S. 974 (1950) (citing *Johnson v.

U.S.*, 82 F.2d 500 (6th Cir. 1936) (citing *Johnson v. U.S.*, 82 F.2d 500 (6th Cir.

1936)).

278.    "Like 'proximate cause,' 'gross negligence' can only have its proper setting

when encircled by the facts and circumstances of the particular case." *Young v.

Dyer,* 161 Va. 434 (Va. 1933).

279.    Moreover, "lack of attention and diligence, or mere inadvertence, does not

amount to wanton or reckless conduct or constitute culpable [gross] negligence for which defendant would be responsible." *Finney v. Finney,* 203 Va. 530 (1962) (quoting *Young,* 161 Va. at 434).

280. "Gross negligence is not to be presumed from the mere happening of an accident", and "gross negligence cannot be inferred from the mere happening of an accident." *Laster v. Tatum,* 206 Va. 804 (Va. 1966) (quoting *Barnes v. Barnes, Adm 'r,* 199 Va. 903 (1958)).

281. Similarly, "[g]ross negligence is defined as conduct showing such indifference to others as constitutes an utter disregard of prudence amounting to complete neglect of the safety of the plaintiff guest, that is, such a degree of negligence as should shock fair minded men although something less than willful recklessness." *Scott v. Foley,* 205 Va. 382 (1964). *See also Bond v. Joyner,* 205 Va. 292 (1964 ).

### *Count Ten: Conspiracy to Commit Terror*

282. "Any national. . . injured. . . by reason of an act of international terrorism. . . may sue therefor. . . and shall recover threefold the damages. . . and the cost of the suit, including attorney's fees." 18 U.S.C. § 2333(a).

283. The State Department Secretary "is authorized to designate an organization as a foreign terrorist organization", 8 U.S.C. § 1189(a)(1), and, since December 12, 2004, *ISIS (formerly al-Qa'ida in Iraq),* known to operate in Central Africa (Congo), Mozambique, Greater Sahara, West Africa, Philippines, *Bangladesh,* Libya, Khorasan Province and Sinai Province, has been a Foreign Terrorist Organizations (FTO)." Editors, "Foreign Terrorist Organizations," *State*

*Department*, December 1, 2025 (emphasis added).

284. Under this provision, a person may bring a civil action "for an injury arising from an act of international terrorism committed, planned, or authorized by an organization", "as of the date on which such act of international terrorism was committed, planned, or authorized, liability", which "may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism." 18 U.S.C. §2332(d)(2).

285. Courts, under these provisions, have considered matters in which "Defendants [had] conspired with ISIS to promote ISIS's *protection racket* so as to maintain ISIS's territorial control in the region, and conspired with ISIS and ANF to provide material support to ISIS and ANF." *Finan v. LaFarge, S.A.*, Civil Action Nos. 22-CV-7831 (NGG) (PK); 23-CV-169 (NGG) (PK); 23-CV-5691 (NGG) (PK), 2025 U.S. Dist. LEXIS 172784, 2025 LX 336668, 2025 WL 2504317 (E.D.N.Y. August 29, 2025) (unpublished).

286. Notwithstanding that even in courts, a claim is presumed to have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged", *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), in support of a "Rationale for the SE Asian SARS-related CoV – Rhinolophus bat target system, and immune priming/boosting" proposal to the Defense Advanced Research Agency (DARPA), Ralph S. Baric, Peter Daszak and Zhengli Shi had posited a

scenario in which "[t]he South and Southeast Asian region [is] where these bats occur", described as "a security hotspot, with active political and ethnic conflicts, and displaced populations in *Bangladesh*, Pakistan, Myanmar, Thailand, Indonesia, Philippines and other countries", presenting, in rationale that "[t]his is a likely potential site for US warfighter deployment". DARPA – PREEMPT – HR001118S0017 (emphasis added).

287.  "Bad faith is normally a question of fact", *Canfield v. Bank One*, 51 S.W.3d 828 (Tex. App. 2001) (citing *Citizens Bridge Co. v. Guerra*, 152 Tex. 361 (1953)), and a reasonable trier of fact would conclude that the "proffered explanation is unworthy of credence". *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248 (1981).

288.  Mindful that "ISIS (formerly al-Qa'ida in Iraq). . . [is] known to operate in. . . Bangladesh", Editors, "Foreign Terrorist Organizations," *supra*, according to some experts, "[a]lthough the effects of non-state actor violence on public health outcomes are well known, the effects of public health crises like the COVID-19 pandemic on non-state actor violence are not"; however, hypothesizing that "[t]hese measures deplete actors' resources, reduce the number of high-value civilian targets, and make it logistically more difficult to conduct attacks", "[u]sing the example of the Islamic State of Iraq and Syria (ISIS), and taking advantage of the exogenous nature of COVID-19 lockdowns," researchers had found that, apparently, "curfews and travel bans significantly reduce violence, especially in populated and non-base areas." Dawn Brancati, Jóhanna Birnir &

Qutaiba Idlbi, *Locking Down Violence: The COVID-19 Pandemic's Impact on Non-State Actor Violence*, 117 Amer. Pol. Sci. Rev .4, pp. 1327-1343, January 30, 2023.

289.   "These effects are most likely due to short-term changes in ISIS's targets and logistics rather than its resources", and "[t]hese findings provide important insights into the security aspects of public health crises and offer novel findings into the general effectiveness of two common counterinsurgency tools." *Id.*

290.   Clearly, a "biological agent", 18 U.S.C. § 178(a)(1), early designated as "a CBRN agent or agents", 85 Fed. Reg. 26, *supra*, and later determined to have been a "chimeric virus", 42 CFR § 73.13(a),  had conducted a force projection movement to result in "20630 confirmed" globally, with "20471 confirmed" in China alone, resulting in "2788 severe" cases and "425 deaths" in that nation with "159 confirmed" cases outside China, in "23 countries" with "1 death", in just two months after its first notice. WHO, Novel Coronavirus(2019-nCoV) Situation Report – 15, February 4, 2020.

291.

292.   *AID AND ABET*

293.   With respect to a disappearance of terrorism some have proposed that "[t]hese effects are most likely due to short-term changes in ISIS's targets and logistics rather than its resources", and "[t]hese findings provide important insights into the security aspects of public health crises and offer novel findings into the general effectiveness of two common counterinsurgency tools." Dawn

Brancati, Jóhanna Birnir & Qutaiba Idlbi, *Locking Down Violence: The COVID-19 Pandemic's Impact on Non-State Actor Violence, supra.*

294.

295.

296.

297.

298.

299.

300.    "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment", while "[f]actual disputes that are irrelevant or unnecessary will not be counted", *Bryson*, Civil Action No.: 5:17-cv-00060, *supra* (citation omitted); "[t]he moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact." *Id.*

301.    "[N]egligence involved in the crime must have been criminal negligence, and it must have been 'reckless or wanton and of such a character as to show disregard of the safety of others under circumstances likely to cause injury or death.'" *Darnell v. Commonwealth*, 6 Va. App. 485 (Va. Ct. App. 1988).

302.    "Means of knowledge with the duty of using them are, in equity, equivalent to knowledge itself." *Cordova*, 84 U.S. at 1.

303.    "To constitute criminal negligence essential to a conviction of involuntary manslaughter, an accused's conduct 'must be of such reckless, wanton or

flagrant nature as to indicate a callous disregard for human life and of the
probable consequences of the act.'" *Davis v. Commonwealth*, 230 Va. 201 (1985)
(citing *Lewis v. Commonwealth*, 211 Va. 684 (1971)).

304.    *A priori*, no reasonable trier of fact, nor even Meta and Zuckerberg can
"dispute that COVID-19," often described as "a highly contagious and deadly
virus, falls within this definition." *Perez*, Crim. Act. No.: 5:20-CR-283-DAE-1,
*supra*.

### *Count Eleven: Religious Freedom Restoration Act*

305.    In the normal course, "when the Government has intentionally designated a
place or means of communication as a public forum speakers cannot be excluded
without a compelling governmental interest", *Cornelius*, 473 U.S. at 788;
"[a]ccess to a nonpublic forum, however, can be restricted as long as the
restrictions are 'reasonable and [are] not an effort to suppress expression merely
because public officials oppose the speaker's view." *Id.* (quoting *Perry Educ.
Ass'n*, 460 U.S. at 37).

306.    Just as the *Religious Freedom Restoration Act (RFRA)* "prohibits the Federal
Government from imposing substantial burdens on religious exercise, absent a
compelling interest pursued through the least restrictive means", *Tanzin v.
Tanvir*, 141 S. Ct. 486 (2020) (citing 107 Stat. 1488, 42 U.S.C. §2000bb *et seq.*),
"[t]he second prong of the test requires the court to review the government's
conduct to ensure that the least restrictive means available were employed to
achieve the legitimate interest of the government"; "[t]his ensures that the

government interest is narrowly tailored to the government conduct."

*Presbyterian Church (U.S.A.)*, 752 F.Supp. at 1505 (citing *Shelton v. Tucker*, 364 U.S. 479 (1960)).

307.    "A statute challenged on equal protection grounds is evaluated under 'strict scrutiny' if it interferes with a 'fundamental right' or discriminates against a 'suspect class.'" *Gray v. Commonwealth*, 274 Va. 290 (2007) (quoting *Kadrmas v. Dickinson Public Schools*, 487 U.S. 450) (1988)).

308.    "Otherwise, a statute will ordinarily survive an equal protection challenge if 'the challenged classification is rationally related to a legitimate governmental purpose.'" *Id.* (citing *Ibid.*).

309.    Courts have rightly "rejected challenges under the *Free Exercise Clause* to governmental regulation *of certain overt acts prompted by religious beliefs or principles*, for 'even when the action is in accord with one's religious convictions, [it] is not totally free from legislative restrictions'", *Sherbert v. Verner*, 374 U.S. 398, 403 (1963) (citing *Braunfeld* v. *Brown*, 366 U.S. 599 (1961) (emphasis added).

310.    Regulation is only proper where "[t]he conduct or actions so regulated have invariably *posed some substantial threat to public safety, peace or order*." *Id.* (citing *Reynolds v. U.S.*, 98 U.S. 145 (1878); *Jacobson v. Massachusetts*, 197 U.S. 11 (1905); *Prince v. Massachusetts*, 321 U.S. 158 (1944); *Cleveland v. U.S.*, 329 U.S. 14. (1946)) (emphasis added).

311.    "Government shall not substantially burden a person's exercise of religion

even if the burden results from a rule of general applicability, except as provided

in subsection (b)", 42 U.S.C. § 2000bb-1(a), while "Mark Zuckerberg, chairman

and CEO of the social media company Meta, said in a letter to the House

Judiciary committee. . . that his teams were 'pressured' by the Biden White

House to censor some content around the Covid-19 pandemic", Colin

McCullough, "Mark Zuckerberg says Meta was 'pressured' by Biden

administration to censor Covid-related content in 2021, *CNN*, August 27, 2024, a

State Actor, even if under duress.

312.    "A person whose religious exercise", as here, doing the work of a church that

had declared itself nonessential, "has been burdened in violation of this section

may assert that violation as a claim or defense in a judicial proceeding and

obtain appropriate relief against a government", and "[s]tanding to assert a

claim or defense under this section shall be governed by the general rules of

standing under article III of the *Constitution*." 42 U.S.C. § 2000bb-1(c).

313.    "Government may substantially burden a person's exercise of religion only if

it demonstrates that application of the burden to the person. . . (1) is in

furtherance of a compelling governmental interest; and (2) is the least restrictive

means of furthering that compelling governmental interest", 42 U.S.C. § 2000bb-

1(b); however, neither Meta nor Zuckerberg, nore even the White House "even

claim that. . . [they had] relied on *any* 'conclusion or statement of *law*,' let alone

one 'issued by an official charged with interpretation, administration, and/or

enforcement responsibilities in the relevant legal field.'" *North*, 910 F.2d at 843

(citing *Barker,* 546 F.2d at 940).

314.   Zuckerberg and Meta "cannot reasonably dispute knowledge of and

involvement", *In re Chembio Diagnostics, Inc. Securities Litigation,* 586

F.Supp.3d at 199, and "[e]very year in January, Mark Zuckerberg announces to

his Facebook $META -1.87% followers (and by extension, the global media) a

new personal challenge", and he "is that face for Facebook." Sarah Kessler &

Sarah Kessler, "The marketing savvy in Mark Zuckerberg's tour of Average

America," *QZ,* July 20, 2022.

315.   According to Meta, "tout[ing] its efforts to inform users about COVID-19 and

vaccines — saying the president's comments", "'more than 2 billion people ha[d]

viewed authoritative information about COVID-19 and vaccines on Facebook,

which is more than any other place on the internet.'" Steven Nelson, "Biden

accuses Facebook of 'killing people' amid censorship row," *New York Post*, July

16, 2021.

316.   "'More than 3.3 million Americans have also used our vaccine finder tool to

find out where and how to get a vaccine'", and their official position has been,

"The facts show that Facebook is helping save lives. Period.'" *Id.*

317.   Yet, "ignorance of fact cannot be predicated of a case where the purchaser is

affected with constructive notice", *Kian v. Kefalogiannis*, 158 Va. 129 (March 24,

1932), and "constructive notice may exist without any actual knowledge or

notice." *Whitney v. Richardson*, 31 Vt. 300 (1858).

318.   *John Hopkins Univ. v. CellPro*, 978 F. Supp. 184 (D. Del. 1997) had considered the extent of liability where "the client is itself knowledgeable and sophisticated. . . . or instead is ignorant and unsophisticated". *Id.*

319.   While that Court had conceded it had "missed the mark in working to bring this matter to a just, speedy and inexpensive determination", nonetheless, it had decided to "take one step in the right direction, . . . by granting plaintiffs' motion for enhancement of damages and entering an order trebling the damages as awarded by the jury." *Id.*

320.   Easily distinguishable from the *vox populi*, on matters "not likely to be within the common knowledge of the average layman", *D.C. v. Barriteau*, 399 A.2d 563 (D.C.1979)), and, in clear contrast,  Meta and Zuckerberg present a considerable advantage in resources.

321.   "Large and sophisticated. . . conspiracies may justify considerably more interception than would a single criminal episode", *U.S. v. Quintana*, 508 F.2d 867 (7th Cir. 1975), and should know that, "[a]lthough a nuclear device is beyond the reach of all but the most sophisticated state-sponsored terrorist groups, a chemical or biological weapon is not"; "[t]he technology is simple and the cost per casualty is extremely low." FM 100-20, *Military Operations in Low Intensity Conflict*, Chap. 3, December 5, 1990 (obsolete).

322.   While certainly one "cannot be expected to disclose *facts of which he is ignorant*", *Gen'l Reinsur. Corp. v. Southern Sur. Co. of Des Moines, Iowa*, 27 F.2d 265 (1928) (quoting  2 *Cooley's Briefs on Insurance*, p. 1206) (emphasis added),

consideration may be warranted for "an exception to the 'mistake of law is not an excuse' rule", in which "[t]he quintessential examples. . . were individuals acting in reliance on a statute later held to be unconstitutional or on a court decision that a statute is unconstitutional that is subsequently overruled." *North*, 910 F.2d at 843 (citing *Barker,* 546 F.2d at 940).

323.   "Every outbreak provides an opportunity to gain important information, some of which is associated with a limited window of opportunity" which "may provide a unique window of opportunity for intervention." Anthony S. Fauci, Clifford Lane & Robert R. Redfield, *Covid-19 — Navigating the Uncharted*, 382 N. Engl. J. Med., pp. 1268-1269, March 26, 2020, and Zuckerberg and Meta incredulously claim to have been wholly caught off guard.

324.   Under federal law, "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal", 18 U.S.C. § 2(a), and "[w]hoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal." 18 U.S.C. § 2(b).

325.   Moreover, according to the Department of Justice (DoJ), aider and abettor liability is distinct from accessory after the fact under 18 U.S.C. § 3. *United States v. James*, 998 F.2d 74, 80 (2d Cir.), *cert. denied*, 510 U.S. 958, 114 S.Ct. 415, 126 L.Ed.2d 362 (1993). An aider and abettor, unlike an accessory after the fact, is punishable as a principal. *Id.* Staff, "2471. 18 U.S.C. § 2," *DoJ*, https://www.justice.gov/jm/criminal-resource-manual-2471-18-usc-2 (accessed

September 1, 2025).

326.   "The Court stated that "[s]ince suicide is a crime, one who aids and abets

another in, or is accessory before the fact to, selfmurder is amenable to the law."

*In re Extradition of Exoo*, 522 F. Supp. 2d 766, 767–85 (S.D.W. Va. 2007) (citing

*State v. Willis*, 255 N.C. 473 (October 11, 1961).

327.   In some jurisdictions, a defendant may also be charged as "a principal in the

second degree or as an accessory before the fact", *U.S. v. Local 560, Intern.*

*Broth. of Teamsters, Chauffeurs, Warehousemen, and Helpers of America*, 581 F.

Supp. 279 (D.N.J. 1984), aff'd, 780 F.2d 267 (3d Cir. 1985), and, in the

Commonwealth of Virginia, he may even be charged as accessory to murder, a

violation of Va. Code § 18.2-32, chargeable to accessories under Va. Code § 18.2-

19.

328.   Moreover, "in cases where the acts of the defendant or the enterprise were

inherently unlawful, such as murder. . . , the courts generally have concluded

that the requisite threat of continuity was adequately established by the nature

of the activity, even though the period spanned by the racketeering acts was

short." *Eisert*, 918 F. Supp. at 601 (E.D.N.Y. 1996).

329.   "'A principal in the second degree is one not the perpetrator, but [merely]

present, aiding and abetting the act done, or keeping watch or guard at some

convenient distance." *Hurd v. Commonwealth*, 159 Va. 880 (1932) (quoting

*Minor's Synopsis Crim. Law*, page 11). See also *Horton's Case,* 99 Va. 848 (1901).

330.   In the Commonwealth, "*[a]ny person* who commits or conspires to commit, or

- 95 -

aids and abets the commission of an *act of terrorism*, as defined in § 18.2-46.4, is guilty of a *Class 2 felony* if the base offense of such act of terrorism may be punished by life imprisonment, or a term of imprisonment of not less than twenty years." Va. Code § 18.2-46.5(A) (emphasis added).

331.    "*Any person* who *commits, conspires to commit, or aids and abets* the commission of an *act of terrorism*, as defined in § 18.2-46.4, is guilty of a *Class 3 felony* if the maximum penalty for the base offense of such act of terrorism is a term of imprisonment or incarceration in jail of less than twenty years." Va. Code § 18.2-46.5(B) (emphasis added).

332.    "*Any person* who *knowingly provides any material support* (i) to an individual or organization whose primary objective is to commit an act of terrorism and (ii) does so with the intent to further such individual's or organization's objective is guilty of a *Class 3 felony.*" Va. Code § 18.2-46.5(D) (emphasis added).

333.    "If the death of any person results from providing any material support, then the person who provided such material support is guilty of a Class 2 felony." *Id.*

334.    A plaintiff "may prove the defendant's knowing participation in a conspiracy through circumstantial evidence, including: (1) the defendant's association with conspirators in furtherance of the conspiracy; (2) his or her presence at 'critical stages of the conspiracy that cannot be explained by happenstance'; (3) his or her 'possession of items that are of essential significance to the conspiracy'; and (4) acts that show a consciousness of guilt, including false exculpatory statements", *U.S. v. Climico*, No. S2 11 CR. 974-08 CM, 2014 WL 4230320, at *1–7 (S.D.N.Y.

Aug. 7, 2014) (quoting *U.S. v. Anderson*, 747 F.3d 51, 60 (2d Cir.2014).

335.    At a minimum, Meta and Zuckerberg possess a "sophistication to build

widespread support online for. . . [a] brutal campaign of terror and violence".

*U.S. v. Shukri Amin*, 85 F.4th 727 (4th Cir. October 30, 2023).

### *Count Twelve: Sections 1981, 1983 and 1988*

336.    "All persons within the jurisdiction of the United States shall have the same

right in every State and Territory to make and enforce contracts, to sue, be

parties, give evidence, and to the full and equal benefit of all laws and

proceedings for the security of persons and property as is enjoyed by white

citizens, and shall be subject to like punishment, pains, penalties, taxes,

licenses, and exactions of every kind, and to no other", 42 U.S.C. § 1981(a).

337.    Meta, in litigations with a court-acknowledge "protracted history". *Webb v.*

*Executive Office of the President*, Civil Action No. 1:23-cv-00816 (D.C. May 14,

2024) had retained, against an unrepresented litigant, a "bet-the-company"

litigation partner, Diana Segso Fassenbender, Staff, "Diana Segzo

Fassenbender, *Orrick*, accessed October 1, 2023, at the prestigious San

Francisco-based international law firm, founded "in San Francisco in 1863", and

marketed as "the second-oldest Bay Area private company after Levi Strauss &

Co.", and their "practice began more than a century ago with the financing of the

Golden Gate Bridge", while boasting over this time securing financing of

landmark projects such as Candlestick Park, the Bay Bridge, BART and the

Moscone Center" so that today they have a team of 300 lawyers based in the Bay

Area", Staff, "Bay Area: San Francisco and Silicon Valley," *Orrick*, accessed

September 25, 2023, alone, focusing "on serving the Technology & Innovation, Energy & Infrastructure and Finance sectors globally." Staff, "Who We Are," accessed September 25, 2023.

338.   In what had been described by the White House as "nothing more than an 'unadorned, the-defendant-unlawfully harmed me accusation' that is ripe for dismissal", White House Memorandum of Points and Authorities in Support of Defendant's Partial Motion to Dismiss, *Webb v. EOP*, Civil Action No. 1:23-cv-00816, p. 5 (D.C. June 17, 2024) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)), Meta had retained a "nationally recognized appellate lawyer", "part of an 'elite cadre' of 75 lawyers who are 'the most influential members of one of the most powerful specialties in America: the business of practicing before the Supreme Court'", who "handles high-stakes appeals across an array of subjects, with a focus on technology", Staff, "Eric Shumsky: Partner," *Orrick*, https://www.orrick.com/en/People/0/7/D/Eric-A-Shumsky (accessed July 16, 2025); however, "[i]f the management knows that certain facts will necessarily prevent the regulatory approval ... and conceals these facts from the investing public, then there is scienter", *In re Chembio Diagnostics, Inc. Securities Litigation*, 586 F.Supp.3d at 199 (citations omitted),

339.   "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities

secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

340.    "In any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title," as well as "the *Religious Freedom Restoration Act of 1993* [42 U.S.C. 2000bb *et seq.*]," " the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs". 42 U.S.C. § 1988(b).

341.    "In awarding an attorney's fee under subsection (b) in any action or proceeding to enforce a provision of section 1981 or 1981a of this title, the court, in its discretion, may include expert fees as part of the attorney's fee", 42 U.S.C. § 1988(c), and had served as a former biological warfare planner, having served as the Executive Officer/*Aide de Camp* and as the most junior commissioned officer to have ever served as the Operations Officer for all U.S. Army strategic counterintelligence, playing a key staff role in standing up the Armed Forces Medical Intelligence Center (AFMIC), *see generally* DODD 6420.1, *Armed Forces Medical Intelligence Center (AFMIC)*, September 30, 1996 , the precursor to the National Medical Intelligence Center (NMIC), *see generally* DODI 6420.01, *National Center for Medical Intelligence (NCMI)*, March 20, 2009, incorporating Change 3, effective September 8, 2020, which was the subject of the ABC News

- 99 -

report. Josh Margolin & James Gordon Meek, "Intelligence report warned of coronavirus crisis as early as November: Sources 'Analysts concluded it could be a cataclysmic event,' a source said," *ABC News*, April 8, 2020; *See also* Fed.R.Evid. 702[15].

## PRAYER FOR RELIEF

342.    "A pleading that states a claim for relief *must* contain. . . a demand for the relief sought, which may include relief in the alternative or different types of relief." Fed. R. Civ. P. 8(a)(3).

343.    In that, under **Count One**, the Legislature had, in conjunction with Election Officials, enacted a provision to placed out for a vote a measure that would directly injury any candidate seeking to qualify for the primary or general ballot, including Webb, he is entitled to and prays for redress in injunctive relief therefor, with respect to the special election, commencing on March 6 to April 18, 2026, and the deadline for applying for an absentee ballot has been set for April 10, 2026, Staff, "Upcoming Elections," *supra*.

344.    In that, under **Count Two**, the Legislature, along with Elections Officials, had enacted a provision involving a "device", under a short fuse, with little or no explanation, understanding of which had been a  "prerequisite for voting", to "demonstrate the ability to read, write, understand, or interpret any matter",

---

[15] "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." *Id.*

and to "demonstrate. . . educational achievement or his knowledge of any particular subject", 52 U.S.C. § 10501(b)(1) and (2), in direct violation of state law, Va. Code § 24.2-126(A), Webb is entitled to and prays for redress in injunctive relief therefor, with respect to the special election, commencing on March 6 to April 18, 2026, and the deadline for applying for an absentee ballot has been set for April 10, 2026, Staff, "Upcoming Elections," *supra*.

345.    Moreover, "[w]henever. . . an aggrieved person institutes a proceeding under any statute to enforce the voting guarantees of the *[F]ourteenth* or *[F]ifteenth [A]mendment* in any State or political subdivision *the court shall authorize* the appointment of Federal observers by the Director of the Office of Personnel Management", 52 U.S.C. § 10302(A).

346.    In that, under **Count Three**, the Legislature, along with Elections Officials, had enacted a measure in conflict with the *Apportionment Clause*, when read *in pari materia*, Webb is entitled to and prays for redress in injunctive relief therefor, in addition to declaratory relief, to declare the proposed measure as unconstitutional.

347.    In that, under **Count Four**, the Legislature, along with Elections Officials, had enacted a provision involving a measure that would adversely impact "[t]he extent to which members of a protected class ha[d] been elected to office in the State", 52 § 10301(b),  so that they would have "less opportunity than other members of the electorate to participate in the political processes or to elect representatives of their choice." § 24.2-126(B), and reasonably expected to

"result[] in a denial or abridgement of the right of any citizen of the United States to vote based on race or color or membership in a language minority group", Va. Code § 24.2-126(A), such "that the political processes leading to nomination or election in the state or a locality are not equally open to participation by members of a protected class in that its members have less opportunity than other members of the electorate to participate in the political processes or to elect representatives of their choice", § 24.2-126(B), Webb is entitled to and prays for redress in injunctive relief therefor, in addition to declaratory relief, to declare the proposed measure as unconstitutional.

348.    Moreover, "[w]henever. . . an aggrieved person institutes a proceeding under any statute to enforce the voting guarantees of the *[F]ourteenth* or *[F]ifteenth [A]mendment* in any State or political subdivision *the court shall authorize* the appointment of Federal observers by the Director of the Office of Personnel Management", 52 U.S.C. § 10302(A).

349.    In that, under **Count Five**, Webb and his political campaigns have been injured in reputation, imposed by Meta and Zuckerberg, through a tortious interference, he is, therefore, entitled to monetary damages and injunctive relief for civil and business conspiracy, Va. Code §§ 18.2-499 to 500, as well as for tortious interference and punitive damages, for damages associated with the "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan,* 376 U. S. 254 (1964),

350.    In that, under **Count Six**, Webb and his political campaigns have been injured by Meta and Zuckerberg, while they had accrued an unjust enrichment, with respect to promotions of patently false claims, contrary to law, with respect to the nature and dangers of the novel virus, as well as regarding the nature and dangers associated with the "medical countermeasures against COVID–19", 85 Fed. Reg. 52, March 17, 2020, he is entitled to personal damages therefor.

351.    In that, under **Count Seven**, Meta and Zuckerberg, in violation of the *Hatch Amendment*, had, "intentionally injure[d]" him, while he had been "lawfully exercising or seeking to exercise the *First Amendment* right of religious freedom at a place of religious worship", they are, thereby,  "subject to the penalties provided in subsection (b) and the civil remedies provided in subsection (c)", 18 U.S.C. § 248(b)(2), to include injunctive relief therefrom. 18 U.S.C. § 248(c)(1)(B).

352.    In that, under **Count Eight**, Meta and Zuckerberg, at a time "when all countries c[ould] still change the course of this pandemic", Tedros Adhanom Ghebreyesus, "WHO Director-General's opening remarks at the media briefing on COVID-19," *supra*, while possessing "knowledge that any of the wrongs conspired to be done and mentioned in section 1985 of this title, [we]re about to be committed," and while possessing the "power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, . . . shall be *liable to the party injured. . .* for all damages caused by such wrongful act", 42 U.S.C. § 1986, and Webb is entitled and prays for relief therefor.

353.    In that, under **Count Eight**, through "an overt act in furtherance of the

- 103 -

object of the conspiracy that [had] injure[d] plaintiff in his person or property",

depriving him "of having or exercising any right or privilege of a citizen of the

United States", *Hobson*, 737 F.2d at 1, Webb is entitled to and prays for damages

therefore, to include damages related to intentional infliction of emotional

distress. *Thompson*, 590 F. Supp. 3d at 46 (quoting 42 U.S.C. § 1985(3)). .

354.    In that, under **Count Nine**, arising from a "pattern of racketeering activity",

18 U.S.C. § 1962(b), attributed to an "enterprise" of which Zuckerberg and Meta

had been apart, to the detriment of Webb, he is entitled to and prays to "recover

threefold the damages he [had] sustain[ed] and the cost of the suit, including a

reasonable attorney's fee". 18 U.S.C. § 1964(c).

355.    In that, under **Count Ten**, Webb is a "national. . . injured. . . by reason of an

act of international terrorism", with which Meta and Zuckerberg had been

associated, and "may sue therefor" to recover threefold the damages. . . and the

cost of the suit, including attorney's fees", 18 U.S.C. § 2333(a), he is entitled to

and prays for relief therefor.

356.    In that, under **Count Eleven**, Webb "is person whose religious exercise ha[d]

been burdened in violation of" the *RFRA*, 42 U.S.C. § 2000bb-1(c), because of

overt actions committed by Meta and Zuckerberg, in permanent disabling of

Webb's Facebook account, and access to what had become his place of worship,

*Jingrong*, 16 F.4th at 47, and, therefore, "may assert that violation as a claim or

defense in a judicial proceeding and obtain appropriate relief against a

government", 42 U.S.C. § 2000bb-1(c), he is entitled to and prays for relief

therefor.

357.  In that, under **Count Twelve**, Webb is entitled to expert and attorneys fees, in accordance with 42 U.S.C. §§ 1981, 1983 and 1983, he prays for relief therefor, in addition to such other equitable relief deemed appropriate and necessary by the Court.

## CERTIFICATION

Petitioner declares under penalty of perjury that no attorney has prepared or assisted in the preparation of this document.

     Major Mike Webb, 3445 Washington Boulevard, #306, Arlington, Virginia 22201
     Name of *Pro Se* Party (Print or Type)

_____ Executed on: _____(Date)
Signature of *Pro Se* Party

Subscribed, acknowledged and sworn to before me, the undersigned Notary Public in the County

of **ARLINGTON**_____ , in the Commonwealth of Virginia, this ___**26** TH_____

day of **FEBRUARY**_____ , 20 **26**____ .

_____
NOTARY PUBLIC

NIRMALI S SILVA
Notary Public
Commonwealth of Virginia
Registration No. 8115744
My Commission Expires Nov 30, 2028

My commission expires: **NOVEMBER 30 TH 2028** Registration Number: ___**8115744**,___

- 109 -